[No. S004461, Crim. No. 22742. June 27, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
RICHARD E. GRANT, Defendant and Appellant.

[Crim. No. 25209. June 27, 1988.]

In re RICHARD E. GRANT on Habeas Corpus.

832

**COUNSEL**

Frank O. Bell, Jr., State Public Defender, under appointment by the Supreme Court, Ezra Hendon and Michael Pescetta, Deputy State Public Defenders, for Defendant and Appellant and Petitioner.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Jane N. Kirkland, Edmund D. McMurray and Wanda Hill Rouzan, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

MOSK, J.—This is an automatic appeal (Pen. Code, § 1239, subd. (b))[1] from a judgment of death under the 1978 death penalty law (§ 190.1 et seq.). As will appear, we conclude that the judgment must be affirmed in all respects.

Defendant was charged with the murders of Edward Halbert and Frank Forman. Two special circumstances were alleged: multiple murders (§ 190.2, subd. (a)(3)) and previous conviction of murder (§ 190.2, subd. (a)(2)). He pleaded not guilty.

Most of the evidence linking defendant to the deaths of Halbert and Forman was circumstantial. Both men abruptly disappeared from the Trinity Alps Preserve (the Preserve) in Shasta County in April or May of 1980 and were not seen again by relatives or friends.

Edward Halbert, with his motorcycle and van, accompanied defendant to Shasta County in April 1980. Halbert's friend Diane Wilson, who remained in the San Bernardino residence she shared with defendant's wife, reported that she never saw Halbert after he left with defendant for the Preserve. When defendant visited her in mid-July, he told her that Halbert was away "taking care of business"; in October, when she expressed anxiety about Halbert's continued absence, defendant told her to stop crying because "Edward was no longer going to be part of the group." He boasted that he "blew away" a man in Shasta—apparently Forman—who had beaten his wife and children and announced that he was waiting for the skull to deteriorate so that he could use it as a candle holder. In the meantime, he was "having fun with [the victim's] jeep." Wilson noted that defendant was wearing clothing she had purchased for Halbert.

In April, defendant traded Halbert's motorcycle to a resident of the Preserve, telling him that Halbert had gone "down south." Halbert's father last saw his son on April 14, at which time he gave him a shotgun. Despite Halbert's promise to visit in a couple of weeks, he did not return or call. Defendant later traded Halbert's shotgun and van to another Preserve resident.

Frank Forman's disappearance was equally sudden. Forman had moved to the Preserve with his wife Pat in January 1980. He was belligerent with neighbors and with his wife and her children. She left the region in April

---

[1] All statutory references hereafter are to the Penal Code unless otherwise indicated.

following an incident in which he swung an axe at her and her children, and spoke with him by telephone for the last time in May 1980.

In the same month Forman deliberately drove his jeep through a neighbor's newly strung barbed wire fence, apparently because he objected to the fencing of Preserve land. The same night, someone fired shots over the trailer in which the neighbor and his family resided. The neighbor saw Forman for the last time the following day. A month later he commented to defendant that he hoped Forman would not return; defendant responded that he could personally guarantee Forman would not be coming back and offered to show him Forman's skull to prove it.

In July or August, after her husband had failed to make payments on their Preserve property, Pat Forman returned and found the residence in shambles. She became reacquainted with defendant and they lived together for a couple of months. One night in September, after they had been drinking heavily, Pat expressed her fear that Forman might return. Defendant assured her that she need not worry because he had blown off half of Forman's head and could show her the skull. In September, defendant sold Forman's jeep to a resident of Shasta County.

Defendant and Pat Forman broke off their relationship and she was joined at the Preserve by her former husband, Mark Kingrey, who became a friend of defendant. In January 1981, while walking with defendant on his property, Kingrey was warned not to follow a cow path they came across because it led to a shallow grave. It was not until February 25, the day after defendant was arrested on another charge, that Pat Forman and Kingrey recalled defendant's comments and decided to explore the gravesite. On finding that it contained human remains, they notified the police.

Investigators excavated the gravesite on February 25 and returned the following day to excavate a second. The first grave contained the remains of Halbert, unclothed and wrapped in a sheet and two blankets. Death was caused by a gunshot wound to the head. The second grave contained the body of Forman, killed by a wound to the abdomen and a massive wound to the head. Both bodies were badly decomposed, having been in the graves for several months. The bullet in Halbert's skull could have been fired from the weapon seized from defendant upon his arrest on February 24.

In addition to his boasts to friends of having killed a man in Shasta County, defendant twice made admissions to law enforcement officers. First, while defendant was in San Bernardino County jail awaiting sentence on an entirely distinct charge, Deputy Sheriff Larry Malmberg searched his cell after receiving complaints of threatening telephone calls by defendant to

his wife, who had testified against him on that earlier charge. Finding her telephone number on a matchbook, Malmberg asked defendant how he acquired the number. Defendant said he had asked her employer for the number, voluntarily adding that "it was because of his wife that he killed two people and that she should not slide for it."

On the second occasion, while defendant was en route from San Bernardino to Shasta County in November 1981, he spontaneously asked Officer Bradd McDannold "if [he] would be surprised if [he] knew why Ed was killed." Defendant then explained that he killed Halbert because Halbert had an obsession to kill "cops and Jews"—describing an incident in which he had to physically restrain Halbert from killing a deputy. Defendant added that he personally believed one in ten policemen was good and did not want Halbert to kill that one good policeman. He recounted that Halbert went to sleep one night and did not wake up, observing that it was a lot more humane the way he had done it than it would have been if the situation had been reversed. He also told McDannold that Forman was killed because of a shooting incident in the Preserve, when he shot into a trailer occupied by a man and his family. Defendant insisted that he wanted the truth to be known so that people did not think he was a deranged killer; he claimed to have killed Halbert and Forman "for the protection of other people." After reading McDannold's notes on the admissions, defendant commented, "That about covers it."

The jury found defendant guilty of first degree murder of Edward Halbert, but guilty of voluntary manslaughter of Frank Forman. It therefore found the multiple-murder allegation not true.

Defendant was also charged with the special circumstance of a prior conviction of first degree murder. He had been sentenced in September 1981 to a prison term of 27 years to life for the October 1980 murder of Bobby Floyd, after a dispute in which he attacked Floyd for leaving two women, one of whom was defendant's wife, alone in the house with him without knowing who he was, when he "could have been a nut and could have killed them." Defendant shot the unarmed Floyd in the chest at close range. Defendant presented no defense to this special circumstance allegation and the jury found the charge true.

At the penalty trial the prosecution presented evidence of a series of previous criminal activities. Defendant stipulated he was convicted in 1978 for cultivation of marijuana. The prosecution showed that he sexually assaulted and severely beat a young woman in Hawaii after offering to drive her home from a bar where she had been celebrating her birthday. Next, the prosecution introduced proof that defendant battered Gary Wayne George

with the butt of a gun after an argument over whether George had stolen a friend's cigarettes. It also presented evidence of several violent incidents in the Shasta County jail: defendant assertedly forced another prisoner at knife-point to orally copulate him; he severely beat and left his footprint on the head of another inmate, Dennis Walker. He allegedly stabbed a third inmate, Mark Kingrey, the Trinity Preserve neighbor who had reported the graves on defendant's property to the authorities. There was also testimony that defendant threatened to kill Deputy Tom Bosenko because he believed he was not being treated fairly while incarcerated, and presented a home-made knife to another deputy, urging him to show it to Bosenko and ask him whether he thought he could survive long enough to get to the emergency room with his jugular vein cut.

The defense presented witnesses to rebut the charge of pistol-whipping George; both witnesses denied seeing any marks of such a battery, but stated that George did have a swollen lip which defendant admitted having inflicted when George "back-talked" him. Other witnesses testified in rebuttal to the alleged attacks against Walker, stating it was a "stand-up fight" provoked by Walker, and against Kingrey, who they claimed was stabbed by someone while defendant was asleep in his cell. The defense also presented Edward Zirkelbach, who testified that he was a friend of defendant at the Preserve and had enjoyed defendant's visits to his home on several occasions. Finally, the defense presented Cynthia Tanner, a teenage girl who knew defendant at the Preserve. She testified that defendant once bought groceries for her family when they were without funds, and that he advised her to listen to her parents because they cared about her, unlike his own parents' relationship to him. She admitted on cross-examination that defendant told her he had killed some men and "shrunk their heads," and that the skulls were buried on his property. Defendant himself testified that of the two possible penalties facing him, he preferred death. The jury returned a sentence of death, and the court entered judgment accordingly.

## I. Guilt Phase Issues

Defendant contends the judgment of guilt must be reversed on several grounds, but none of his claims is persuasive.

### A

Defendant first maintains there was insufficient evidence as a matter of law to support the finding of premeditation and deliberation in the Halbert killing. We disagree. Although there were no third-party witnesses to the homicide, there was ample circumstantial proof and direct confession evidence by defendant to persuade a jury of his guilt beyond a reasonable

doubt. (*People* v. *Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].)

First, there was clear evidence of motive, however self-serving and idiosyncratic. Defendant claimed he had already used force to prevent Halbert from attacking a policeman and that he acted to prevent Halbert from carrying out an asserted obsession to kill policemen and Jews. The jury apparently did not believe defendant's alternate explanation to Larry Malmberg that he killed two men "because of" his wife. (*People* v. *Nugent* (1971) 18 Cal.App.3d 911, 915 [96 Cal.Rptr. 209]; *People* v. *Gelfuso* (1971) 16 Cal.App.3d 966, 972 [94 Cal.Rptr. 535].)

Second, the manner of killing showed deliberation and premeditation. Defendant claimed to have killed Halbert as he lay sleeping, and the condition of the body—unclothed and wrapped in sheet and blankets—supports this admission. Defendant's comment to McDannold that the killing was "humane" indicates a deliberate execution, and the single shot through the head suggests the method was particular and exacting. The jury could reasonably conclude that defendant's act of shooting a sleeping man in the head lacked immediate provocation and was the product of preexisting reflection rather than impulse.

### B

■ Defendant next contends his statements to Police Officers McDannold and Malmberg were elicited in violation of his constitutional privilege against self-incrimination. In his admissions to McDannold, defendant maintains, he did not knowingly or intelligently waive his right to remain silent; rather, he was pressured into offering incriminating explanations for the deaths of Halbert and Forman by the circumstances of the transportation in custody between San Bernardino and Shasta Counties. He insists that by subjecting him to a lengthy drive in the company of police officers intent on listening for statements that could be used against him, rather than transferring him by a short airplane ride, he was induced to defend his actions. He argues that his asserted reason for confessing—so that people would not regard him as a deranged killer—demonstrates that he did not speak spontaneously or voluntarily, but rather to justify himself to his captors.

The claim is without merit. If it were valid, virtually all confessions by an accused in custody would be held involuntary, even if initiated by the accused himself. Transportation of a prisoner by car, listening for voluntary incriminating remarks, and custodial restraint of potentially dangerous individuals are not inherently suspect police activities. In the present case,

Officer McDannold did not interrogate defendant at any time; indeed, he made it clear at one point that he could not ask questions. Under the totality of the circumstances, defendant's admissions were voluntary and hence admissible. (*People* v. *Sanchez* (1969) 70 Cal.2d 562, 576 [75 Cal.Rptr. 642, 451 P.2d 74].)

■ Turning to the statement to Officer Malmberg, we are guided by the principles recently set forth in *Arizona* v. *Roberson* (1988) 486 U.S. __ [100 L.Ed.2d 704, 108 S.Ct. 2093], in which the high court held that a suspect in custody who has invoked his right to counsel is not subject to further *interrogation* even if it is about an offense unrelated to the subject of the initial investigation unless the accused himself initiates the renewed communication with police. We find that Officer Malmberg's question as to how defendant obtained his wife's telephone number did not constitute interrogation within the meaning of *Roberson*. Thus, there was no error.

Even if, arguendo, this voluntary statement should not have been admitted, no prejudice appears. We pointed out in *People* v. *Murtishaw* (1981) 29 Cal.3d 733, 756 [175 Cal.Rptr. 738, 631 P.2d 446], that while an improperly admitted confession will result in reversal, "the wrongful introduction of an admission is not reversible if the People can show beyond a reasonable doubt that the error complained of did not contribute to the verdict." Here the police officer discontinued the conversation without further questioning when defendant volunteered his admission. In addition, the statement to Malmberg was only one of a long series of incriminating admissions defendant made to various people. Thus he boasted repeatedly to friends that he "blew away" a man at the Preserve, intimating that he intended to use the skull of a man he killed as a candle holder, and even pointing out the location of a shallow grave on his property. He spontaneously revealed to McDannold his motivation and method for killing Halbert and Forman. In these circumstances we are convinced beyond a reasonable doubt that the introduction of defendant's revealed admission did not contribute to the verdict.

C

■ Third, defendant contends the court abused its discretion in denying a continuance to permit him and his counsel to interview two potential witnesses. No abuse of discretion appears.

Two weeks before the defense was to begin its case, counsel requested that two state prison inmates be compelled to testify. The men were transferred to the Shasta County jail on the day the prosecution rested and the defense was scheduled to begin putting on its case. Although he stated that

the witnesses would testify on his behalf, defendant refused to reveal the nature of their testimony until a mere four days before they were to be called to the stand. Even then, defendant disclosed only that the testimony was "alibi-related," and defense counsel was unprepared to make an offer of proof.

On the morning of their arrival at the jail, defense counsel attempted to speak with the witnesses, but they refused to disclose any information until they spoke with defendant personally. Defendant was thereafter permitted to confer with the witnesses for 50 minutes, but in the apparently false belief that the room was electronically monitored, he avoided all reference to his case. He ordered the witnesses to reveal nothing, even to his own counsel, until he spoke with them further. In court that same day, counsel stated that without speaking further with the witnesses he was unsure about the value of their testimony: "I do not feel that the testimony of these witnesses would be—well, I feel it would be more harmful, but I cannot in good faith say that until I've actually talked to them." The court recessed proceedings temporarily, instructing counsel to confer with the witnesses and return with a decision about their testimony. When counsel attempted to discuss the case with the witnesses, however, they refused to speak even about the general subject matter of their testimony.

Defendant continued to insist that he be given further opportunity to confer with the witnesses before they talked to anyone else, and his counsel requested a continuance of three days to speak further with them. The court refused, directing counsel to decide without additional delay whether to use the testimony. Counsel then determined that he would not bring in the two witnesses, stating that "I feel it would hurt Mr. Grant. Hurt his case and my credibility with this jury."

A continuance will be granted only on a showing of good cause. (§ 1050, subd. (e).) Both defendant and counsel must demonstrate that they exercised due diligence and all reasonable efforts to prepare for trial (*People* v. *Johnson* (1970) 5 Cal.App.3d 851, 859 [85 Cal.Rptr. 485]), and the court has broad discretion to grant or deny the motion for continuance (*Ungar* v. *Sarafite* (1964) 376 U.S. 575, 589 [11 L.Ed.2d 921, 931, 84 S.Ct. 841]; *People* v. *Courts* (1985) 37 Cal.3d 784, 790 [210 Cal.Rptr. 193, 693 P.2d 778]). Here the record establishes that it was defendant's own persistent lack of cooperation that created the need for a continuance. In light of defendant's deliberate obstruction of his own counsel's reasonable attempts to determine the nature of the proposed witnesses' testimony, the denial of a continuance was neither arbitrary nor a violation of due process.

## D

■ Defendant next urges he was deprived of due process when certain pretrial proceedings were conducted in his absence. On February 25, 1982, defendant voluntarily absented himself from a hearing on a discovery motion by his counsel. Over the prosecution's objection, the court ruled that his presence was not required. Defendant subsequently executed a form voluntarily waiving his presence at any stage of the proceedings at which the court would permit his absence, and agreeing that his interest would be deemed represented at such proceedings by his counsel.

Defendant now maintains that in a capital case the personal presence of the defendant is mandatory at all proceedings and may not be waived. His contention, which is directly contrary to our clear holdings that even a capital defendant may waive his presence at certain proceedings without violating due process (*People* v. *Harris* (1981) 28 Cal.3d 935, 955 [171 Cal.Rptr. 679, 623 P.2d 240]; *People* v. *Jackson* (1980) 28 Cal.3d 264, 309 [168 Cal.Rptr. 603, 618 P.2d 149]), is premised on a misreading of federal constitutional requirements.

The practice of a state to permit a defendant in its criminal courts to waive his presence at a proceeding from which no injury results to his substantial rights is a regulation of criminal procedure within the authority of the state to adopt, and is not a denial of due process. (*Frank* v. *Mangum* (1915) 237 U.S. 309, 340 [59 L.Ed. 969, 985, 35 S.Ct. 582].) Although the federal Constitution requires a criminal defendant to be present at those stages of trial in which his absence might frustrate the fairness of the proceedings (*Faretta* v. *California* (1975) 422 U.S. 806, 819, fn. 15 [45 L.Ed.2d 562, 572-573, 95 S.Ct. 2525]), there is no requirement that he appear at every proceeding without exception if he knowingly and intelligently waives the right to do so.

Defendant relies on a dictum in *Hopt* v. *Utah* (1884) 110 U.S. 574, 579 [28 L.Ed. 262, 265, 4 S.Ct. 202], to the effect that "it was not within the power of the accused or his counsel to dispense with the statutory requirement as to his personal presence at the trial." But in *Snyder* v. *Massachusetts* (1934) 291 U.S. 97 [78 L.Ed. 674, 54 S.Ct. 330, 90 A.L.R. 575], the court explicitly rejected the dictum in *Hopt,* stressing that in any case "it deals with the rule at common law and not with constitutional restraints." (*Id.* at p. 117, fn. * [78 L.Ed. at p. 684].) The court observed that the privilege to be present "may be lost by consent" (*id.* at p. 106 [78 L.Ed. at p. 678]) and emphasized that "Nowhere in the decisions of this court is there a dictum, and still less a ruling, that the Fourteenth Amendment assures the

privilege of presence when presence would be useless, or the benefit but a shadow." (*Id.* at pp. 106-107 [78 L.Ed. at p. 678].)

Under our statute, a defendant may waive his presence at any stage of the proceedings in which he does not have a fundamental right to be present. (§ 977.) Defendant's confrontation rights are not infringed by this statute, which expressly requires that he be present during any examination of witnesses.

None of the proceedings at issue here necessitated defendant's presence. The first was a discovery motion by the defense and the filing by the prosecution of notice of evidence to be presented at the penalty stage. Second, after defendant signed a written waiver of his presence, he refused to appear at a discussion of procedures for handling jury selection and a continuing discovery motion. Third, he declined to be present during the first half-hour of jury selection, at which time jurors were excused for physical disability or financial hardship. In all these instances defendant's presence would have served little if any purpose; but in any event he voluntarily elected to absent himself, and willingly permitted his counsel to act on his behalf. No error appears.

E

■ Next defendant contends the court erred in giving an incomplete jury instruction on the definition of malice and on the effect of diminished capacity on defendant's ability to form the requisite mental state for a finding of first degree murder. Both contentions fail for the same reason: there was no substantial evidence of diminished capacity to warrant such instructions.

The court read CALJIC No. 8.11 (1981 rev.): "Malice is express when there is manifested an intention unlawfully to kill a human being." Defendant maintains that at the time he was tried, the definition included the requirement that he be aware of "the obligation to act within the general body of laws regulating society" but acted despite that awareness. (*People* v. *Conley* (1966) 64 Cal.2d 310, 322 [49 Cal.Rptr. 815, 411 P.2d 911].) As the People aptly point out, Chief Justice Traynor wrote in *Conley* that such awareness is already implicit in the definition of express malice as the deliberate intention unlawfully to take life, and that a normal capacity to comprehend the duty society places on all persons to act within the law is assumed—unless there is evidence of mental defect, disease, or intoxication. (*Ibid.*)

Defendant insists that the jury could have regarded his stated motive for killing Halbert—allegedly Halbert's obsession with killing "cops and

Jews"—as delusional, and if properly instructed could have concluded he lacked the fundamental understanding of his obligation to act within the law. Defendant likens his case to *People* v. *Gorshen* (1959) 51 Cal.2d 716, 722 [336 P.2d 492], in which the defendant killed because he believed it necessary to prevent his own insanity, and to *People* v. *Skinner* (1985) 39 Cal.3d 765, 778 [217 Cal.Rptr. 685, 704 P.2d 752], in which the defendant believed his killing was "commanded by God." Under these authorities, defendant contends, the court was required to instruct sua sponte regarding the effect of diminished capacity on the formation of mental states. (CALJIC No. 8.77 (1979 rev.).)

We are not persuaded. The court was presented with no evidence of mental illness or diminished capacity. The court-appointed psychiatrist reported that defendant was sane both at the time of trial and at the time of the killings, and concluded that no psychiatric defense could reasonably be raised. The probation report attributed defendant's actions not to mental illness but to a distorted sense of justice according to which defendant rationalized executing those he believed deserved it. Defense counsel did not argue that defendant's acts were grounded in delusion or that he lacked capacity to understand the nature of his deeds. Unlike the defendants in *Gorshen* or *Skinner,* defendant did not claim to have been "commanded" to kill by supernatural forces or in defense of his own sanity.

■ When there is no substantial evidence of diminished capacity, the court does not err in omitting to give instructions sua sponte based on that defense. (*People* v. *Flannel* (1979) 25 Cal.3d 668, 681 [160 Cal.Rptr. 84, 603 P.2d 1]; *People* v. *Mayberry* (1975) 15 Cal.3d 143, 151 [125 Cal.Rptr. 745, 542 P.2d 1337]; *People* v. *Carr* (1972) 8 Cal.3d 287, 294 [104 Cal.Rptr. 705, 502 P.2d 513].) ■ Similarly, although the court is obligated to instruct on principles of law closely and openly related to the case, it has no duty to instruct on theories that are not supported by the evidence. (*People* v. *Flannel, supra,* at p. 681; *People* v. *Perry* (1972) 7 Cal.3d 756, 788-789 [103 Cal.Rptr. 161, 499 P.2d 129].)

F

Finally, defendant contends the excusal for cause of prospective jurors who would automatically vote against the death penalty deprived him of his due process right to a fair trial at the guilt phase and violated his Sixth Amendment right to a representative jury. The argument has previously been rejected by this court (*People* v. *Fields* (1983) 35 Cal.3d 329, 342-353 [197 Cal.Rptr. 803, 673 P.2d 680] [plur. opn.], 374 [conc. opn. of Kaus, J.]), and more recently by the United States Supreme Court (*Lockhart* v.

*McCree* (1986) 476 U.S. 162, 172-174 [90 L.Ed.2d 137, 147-148, 106 S.Ct. 1758, 1764-1766]).

## II. SPECIAL CIRCUMSTANCE ISSUE

■ Defendant contends that under the chronology of this case the special circumstance finding that he was "previously convicted" of murder (§ 190.2, subd. (a)(2)) must be set aside. The sequence of events is undisputed. Defendant killed Edward Halbert in May 1980 and Bobby Floyd in October of the same year. He was arrested for the Floyd homicide on February 24, 1981, and was found guilty of first degree murder for that crime in May 1982. After his arrest, detectives discovered the shallow grave containing the remains of Halbert, and defendant was eventually charged with the murder of Halbert. His trial for that crime began after his trial for the murder of Floyd was completed.

Defendant argues that because both the murder of Floyd and his conviction of that crime took place *after* he killed Halbert, the conviction was not a "previous conviction" within the meaning of the statute. According to defendant, the special circumstance applies only to a defendant who (1) committed a murder chronologically preceding the capital offense for which he is on trial, and (2) had already been convicted of the previous murder before he committed that capital offense—the theory being that the death penalty is appropriate only when a defendant commits murder after he has been put on notice by a previous murder conviction that if he repeats the crime he might suffer the ultimate punishment of death or life in prison without parole. Defendant's construction of the statute is untenable. (*People v. Hendricks* (1987) 43 Cal.3d 584, 595-596.)

## III. PENALTY PHASE ISSUES

Defendant raises a number of claims of error concerning the penalty phase, but none is meritorious.

### A

■ First, defendant asserts that he should not have been permitted to tell the jury that he preferred the death penalty to life in prison without parole.

During the penalty phase the court conducted an in camera hearing on the topic with defendant and his counsel, excluding the district attorney. Although his counsel advised against doing so, defendant said he would "just as soon get up there and request the death penalty." The court advised

defendant at length of the effect such testimony would be likely to have on the jury: "Your desires or your wishes are not necessarily binding on a jury. They have to make up their own minds based on their own analysis or analyses of the evidence presented . . . . And it would be my thinking that this . . . would tend to encourage a jury in reaching the death penalty verdict." The court pointed out that defendant was not permitted "to get the assistance of the State in committing suicide" but that it could not prevent him from testifying: "I think you have a constitutional right to take the stand if that's your desire, even though what you are proposing to do is going to invite a death penalty verdict." The court encouraged defendant to consider his decision carefully in the interim, but explained that "if it's still your desire tomorrow to testify, I don't think we have the right to keep him off the stand."

On the following day defendant was called to testify. The examination was very brief: his attorney simply asked him whether he understood that the jury had to decide between death and life without parole, and if so, which of the two sentences he would prefer. Defendant answered, "The death penalty." He was not cross-examined, and immediately stepped down. The prosecutor did not mention this testimony in his closing argument. Defense counsel argued that the jury should not be influenced by this testimony, urging that it was no more than an attempt to gain status among his fellow inmates and "is a strong argument against giving it to him." Counsel reiterated that the appropriate sentence in this case was not death but life in prison without parole. Finally, the court instructed the jurors that they were "not required to accept his testimony as conclusive on the issue of what penalty shall be imposed, but should give it the weight, if any, to which you find it to be entitled."

Defendant now contends that his testimony on this point constitutes improper aggravating evidence in violation of *People* v. *Boyd* (1985) 38 Cal.3d 762, 773-775 [215 Cal.Rptr. 1, 700 P.2d 782], and may have resulted in an unreliable penalty determination under *People* v. *Deere* (1985) 41 Cal.3d 353, 362-364 [222 Cal.Rptr. 13, 710 P.2d 925], and *People* v. *Burgener* (1986) 41 Cal.3d 505, 541-542 [224 Cal.Rptr. 112, 714 P.2d 1251]. We recently rejected an identical contention on similar facts. (*People* v. *Guzman, post,* pp. 915, 960-961 [248 Cal.Rptr. 467, 755 P.2d 917].)

**B**

■ Defendant next contends the evidence of his alleged threats to kill Deputy Bosenko with a prison-made weapon was erroneously admitted as an aggravating factor. Three jail personnel testified that while he was in jail awaiting trial defendant made threatening overtures against the deputy. In

late March 1982, he told one officer that Bosenko was "playing games" at his expense and that he planned to "move on" him with a shank—a prison-made weapon—sometime during his trial, when he would be assured of maximum publicity for the attack. A second witness testified that on the following day defendant summoned him to his cell and showed him a shank, in this case a toothbrush with a razor blade embedded in the handle. He boasted to a third officer that just such a weapon would be used against Deputy Bosenko, and he dared him to show the knife to Bosenko and ask how long he would survive with his jugular vein cut and whether he thought he could make it to the emergency room "in time."

Section 190.3, factor (b), provides that in determining the punishment for a defendant subject to the death penalty, the trier of fact shall take into account "The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." Defendant maintains that his actions were not admissible because they did not constitute a crime that falls within the limits of that subdivision.

■■■ As defendant points out, the "criminal activity" referred to in the statute must amount to an actual violation of a specific penal statute. (*People* v. *Phillips* (1985) 41 Cal.3d 29, 72 [222 Cal.Rptr. 127, 711 P.2d 423].) There must be sufficient evidence for the trier of fact to determine that the elements of the offense have been proved beyond a reasonable doubt. (*Id.* at pp. 72-73; *People* v. *Boyd, supra,* 38 Cal.3d at p. 778.) In the present case, the prosecution did not specify which crime defendant allegedly committed when he brandished the toothbrush-knife and threatened to kill Deputy Bosenko. ■■■ Clearly, he could have at least been charged with the crime of possessing a deadly weapon while confined in jail. (§ 4574, subd. (a).)

Defendant concedes this offense, but maintains that the crime of possession is "neutral," showing neither intent nor propensity to commit a violent act. Because it does not include as a necessary element either a threat or act of aggression, it may not, he argues, be introduced as an aggravating factor at the penalty trial. According to defendant, criminal activity that involved a threat of violence is limited to inherently violent crimes—that is, crimes which include the use or threat of force as elements of the underlying offense; his offense of possessing the "shank" did not require proof that he intended to use it, and his threats to do so were therefore irrelevant and inadmissible under section 190.3. The contention is without merit.

Defendant offers no support for such a narrow reading of the statute. ■■■ The phrase, "involved the use or attempted use of force or

violence or the express or implied threat to use force or violence," logically includes both crimes that are necessarily violent—e.g., assaultive crimes—and crimes that were perpetrated in a violent or threatening manner. The aim of the provision is to enable the jury to make an individualized assessment of the character and history of a defendant to determine the nature of the punishment to be imposed. The manner in which he carried out a crime—even a misdemeanor or felony such as possession of a lethal weapon—is clearly relevant to that determination. Indeed, we acknowledged this aspect of the provision implicitly in *People* v. *Boyd, supra,* 38 Cal.3d 762, 777, when we excluded evidence of the defendant's attempted escape from custody because under the particular facts the attempt "did not involve violence or the threat of violence." A violent escape attempt, by contrast, would have constituted an aggravating factor.

We conclude that the evidence of defendant's provocative display of an illicit hand-made lethal weapon in jail was admissible and his threats against Deputy Bosenko relevant under section 190.3, factor (b). As a crime that "involved the . . . express or implicit threat to use force or violence," it shed a significant light on defendant's character and history for the purpose of assessing the appropriate penalty.

## C

Defendant contends the court erred in admitting the evidence of his alleged assault against Gary Wayne George. George testified that about August 1980 defendant entered a dispute between another man and George over a pack of cigarettes that the latter was accused of stealing. Defendant was also angry that George was not helpful at his stepfather's ranch. According to George, he unwillingly went off with defendant, intending to go fishing with him, and during their drive was attacked by defendant, who hit him several times on the head with the butt of a gun. Defendant allegedly warned him not to tell anyone about the beating, suggesting that if he did so he might "disappear."

At the automatic new trial motion under section 190.4, the court determined "not to be true the testimony of Gary Wayne George that he was in effect pistol-whipped by the defendant in August of 1980." Defendant claims that because the court disbelieved George's testimony, it was required to remove the evidence from the jury's consideration under section 1118.1. The point is untenable.

Section 1118.1 provides only that in a jury trial a court shall on its own motion or motion by defendant "order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the

evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal." Here the court made no such finding of insufficient evidence. It merely weighed the evidence independently and concluded that it did not believe George's testimony proved beyond a reasonable doubt that he had been pistol-whipped as he claimed. That conclusion would not, however, preclude a contrary finding by the jury on the basis of the same evidence. Indeed, in light of the undisputed testimony by both George and defendant's own witnesses that defendant struck George in the mouth and bruised his lip, there is clearly substantial evidence to support a finding that he assaulted George, a crime involving violence that is admissible in aggravation under section 190.3, factor (b).

### D

■■■ Defendant next contends the court erred by failing to instruct sua sponte in the penalty phase on the elements of the other crimes offered as aggravating factors. In *People v. Phillips, supra,* 41 Cal.3d 29, 72-73, footnote 25, we held that the trial judge has no sua sponte duty to instruct on the elements of the crimes constituting "other criminal activity" under section 190.3. We stressed this rule "recognizes that a defendant for tactical considerations may not want the penalty phase instructions overloaded with a series of lengthy instructions on the elements of alleged other crimes, perhaps because he fears that such instructions could result in the jury placing undue significance on such other crimes rather than on the central question of whether he should live or die." We concluded that in light of such tactical considerations, a defendant who failed to request instruction on the elements of the other crimes may not complain on appeal that the court did not instruct sua sponte. (See also *People v. Ghent* (1987) 43 Cal.3d 739, 773 [239 Cal.Rptr. 82, 739 P.2d 1250].) Any other result would create an intolerable dilemma for the court, under which a defendant sentenced to death could complain when the court *gave* the instruction sua sponte, on the ground that it placed undue emphasis on the "other crimes" evidence, and complain equally when as here the court did *not* so instruct sua sponte, on the ground that the defense intended to challenge the truth of the charges of other criminal activities and hence instruction on their elements was essential. We adhere to the *Phillips* rule and therefore reject this claim.

### E

■■■ Defendant maintains that the prosecution's notice of evidence to be introduced in aggravation was insufficient. Before trial the prosecution filed a notice pursuant to section 190.3, paragraph 4, which provides that "Except for evidence in proof of the offense or special circumstances which subject a defendant to the death penalty, no evidence may be presented by

the prosecution in aggravation unless notice of *the evidence to be introduced* has been given to the defendant within a reasonable period of time as determined by the court, prior to trial." (Italics added.)

The notice, filed February 25, 1982, advised defendant of the particular prior offenses the prosecution planned to prove at the penalty trial, including previous felony convictions and "other criminal activity."[2]

Defendant contends this notice was insufficient as a matter of law. He points to Evidence Code section 140, which defines "evidence" to include "testimony, writings, material objects, or other things presented to the senses that are offered to prove the existence or nonexistence of a fact." He concludes that the prosecution's failure to state such specific evidence in its notice barred it from presenting any proof in aggravation and invalidates the penalty verdict.

The point is unpersuasive. A challenge to the sufficiency of a notice of aggravating evidence under section 190.3, paragraph 4, cannot be resolved by a mechanical application of a general definition of the word "evidence." Rather, the court must decide each such challenge on the particular facts of the case at hand. Here the notice given to defendant (fn. 2, *ante*) advised him of the date, place, and charge of three specific prior felony convictions that the prosecution intended to use against him at the penalty phase, as well as the date, place, nature, and victim of seven additional criminal acts that the prosecution intended to prove he had committed. In these circum-

---

[2]The notice provided in its entirety: "1. That the defendant on or about September 15, 1981, in the Superior Court of San Bernardino County, State of California, was convicted of the first degree murder of Bobby Anderson Floyd, a felony.

"2. That the defendant on or about November 9, 1978, in the Superior Court of San Bernardino County, State of California, was convicted of cultivation of marijuana, a felony.

"3. That the defendant on or about July 29, 1974, in the Supreme Court of the State of New York was convicted of grand larceny auto, a felony.

"4. That the defendant on or about February 2, 1980, in Honolulu, Hawaii, assaulted, raped and forced Mardi Sines to orally copulate his penis.

"5. That the defendant in August of 1980 in the County of Shasta, State of California, assaulted Gary Wayne George by striking him in the head with a firearm.

"6. That the defendant on or about December 13, 1981, in the County of Shasta, State of California, forced Frank Durant to orally copulate his penis.

"7. That the defendant on or about December 13, 1981, in the County of Shasta, committed a battery upon Dennis John Walker.

"8. That the defendant on or about January 3, 1982, in the County of Shasta, State of California, assaulted Mark Everett Kingrey with a deadly weapon.

"9. That the defendant on or about February 8, 1982, in the County of Shasta, State of California, assaulted Russell Maurice Gammon with a deadly weapon."

On April 5, 1982, the prosecution filed further "additional evidence," to wit, "That the defendant on or about March 31, 1982, while an inmate in the Shasta County Jail, threatened to kill Deputy Tom Bosenko."

stances the notice was adequate to fulfill the statutory purpose of advising defendant of "the evidence against him in order to afford him a reasonable opportunity to prepare his defense at the penalty trial" (*People* v. *Howard* (1988) 44 Cal.3d 375, 425 [243 Cal.Rptr. 842, 749 P.2d 279]). If defendant wanted additional information about the matters set forth in that notice, he had only to make an appropriate pretrial discovery motion—and the record shows that defendant successfully so moved, thereby learning still further details of the evidence to be introduced against him. No error appears.

F

Defendant contends that the jury may have been misled to his prejudice about the scope of its sentencing discretion and responsibility by the language of former CALJIC No. 8.84.1 (hereafter former factor (k)). Pursuant to that instruction, the court charged the jurors that in determining the penalty they should consider several specified factors and also, "(k) Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime."

In *People* v. *Easley* (1983) 34 Cal.3d 858 [196 Cal.Rptr. 309, 671 P.2d 813], we concluded that the language of former factor (k) might mislead the jury about the scope of its sentencing discretion and responsibility under the federal Constitution. (*Id.* at pp. 877-878.) In *Lockett* v. *Ohio* (1978) 438 U.S. 586, 604 [57 L.Ed.2d 973, 990, 98 S.Ct. 2954], and *Eddings* v. *Oklahoma* (1982) 455 U.S. 104, 110 [71 L.Ed.2d 1, 8, 102 S.Ct. 869], the United States Supreme Court had held that a sentencer may "not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record . . . that the defendant proffers as a basis for a sentence less than death."

To avoid the risk of misleading the jury in future cases, we have directed trial courts to inform jurors that they may consider in mitigation not only "any . . . circumstance which extenuates the gravity of the crime," but also "any other 'aspect of [the] defendant's character or record . . . that the defendant proffers as a basis for a sentence less than death.'" (*Easley,* 34 Cal.3d at p. 878, fn. 10.)

As for cases—such as the present—which were tried before *Easley* was decided, we have announced that we will examine each such appeal on its merits to determine whether the former factor (k) instruction may have misled the jury to the defendant's prejudice. (*People* v. *Brown* (1985) 40 Cal.3d 512, 544, fn. 17 [220 Cal.Rptr. 637, 709 P.2d 440], revd. on other grounds *sub nom. California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 941, 107 S.Ct. 837].) In conducting such an examination, we look to "the

totality of the penalty instructions given and the nature of the arguments made to the jury' . . . ." (*People* v. *Rodriguez* (1986) 42 Cal.3d 730, 786 [230 Cal.Rptr. 667, 726 P.2d 113].)

 Turning to the case at bar, we first observe that defendant did present character evidence aimed at stirring the sympathy of the jury. Edward Zirkelbach testified that defendant was a long-time friend he had frequently entertained in his home. Cynthia Tanner, a teenager from the Preserve, recounted defendant's generosity to her family when they were destitute, and recalled his concern that she obey her parents and avoid the mistake he made of using drugs and alcohol. She stated that he contrasted her parents to his own, lamenting that "he never had any that were there when he needed them."

Moreover, the prosecutor never urged the jurors to ignore defendant's mitigating character evidence as immaterial.[3] Further, the penalty phase instructions taken as a whole did not preclude the jury from considering defendant's character evidence.

 ██ ██ ██ Accordingly, on this record we cannot conclude that the jury may have been misled to defendant's prejudice by the former factor (k) instruction.[4]

## G

 Relying on *People* v. *Brown, supra,* 40 Cal.3d 512, 538-544, defendant contends that in combination with the prosecutor's closing argument

---

[3] Relying on *People* v. *Davenport* (1985) 41 Cal.3d 247 [221 Cal.Rptr. 794, 710 P.2d 861], defendant argues in substance that the prosecutor's argument made the potentially misleading effect of the former factor (k) instruction actual. His reliance is misplaced. In that case, the prosecutor declared that the defendant's background could be considered in mitigation only if it related to the crime itself. Here, by contrast, there was no such argument.

[4] Defendant makes two additional claims. The first is that the court erred by delivering an antisympathy instruction at the penalty phase. The point lacks merit. The court delivered no such instruction. Although it had properly admonished the jury at the guilt phase under CALJIC No. 1.00 not to give way to emotion and to "reach a just verdict regardless of what the consequences of such verdict may be," it did not repeat that instruction at the penalty phase. In any event, an antisympathy instruction does not violate the Eighth Amendment to the United States Constitution. (*California* v. *Brown, supra,* 479 U.S. 538 [107 S.Ct. 837].)

Defendant also claims the court erred by refusing to instruct the jury that "in this part of the trial the law does not forbid you from being influenced by pity for the defendant." We rejected this point in *People* v. *Washington* (1969) 71 Cal.2d 1061, 1095 [80 Cal.Rptr. 567, 458 P.2d 479]. To the extent the requested instruction may have been meant to tell the jury it could act on the basis of pity unrelated to the evidence in the case, it was wrong. (See *California* v. *Brown, supra,* 479 U.S. 538, 542 [107 S.Ct. 837, 840].) To the extent it invited the jury to give effect to defendant's mitigating character evidence, it was surplusage because other instructions and argument adequately told the jurors they could do so.

the instruction embodying the apparently mandatory sentencing language of section 190.3 may have misled the jury to his prejudice about the scope of its sentencing discretion and responsibility. Section 190.3 states in relevant part that "the trier of fact shall consider, take into account and be guided by the aggravating and mitigating circumstances referred to in this section, and shall impose a sentence of death if the trier of fact concludes that the aggravating circumstances outweigh the mitigating circumstances."

In *Brown* we held that the sentencing language of section 190.3 was not unconstitutional in itself. (40 Cal.3d at pp. 538-544.) Nevertheless, we recognized that when delivered in an instruction the unadorned statutory language might mislead the jury as to the scope of its sentencing discretion and responsibility. (*Id.* at p. 544, fn. 17.) To avoid such a risk, we directed trial courts thereafter to instruct juries in conformity with the principles set forth in *Brown,* rather than in the bare words of the statute. (*Ibid.*) With respect to cases—such as the present—in which the jury had been instructed in the statutory language, we declared that we would examine each such appeal on its merits to determine whether the jury may have been misled to the defendant's prejudice. (*Ibid.*)

Our concerns in *Brown* were essentially two. The first was that the unamplified language of section 190.3 might mislead the jury as to the nature of the weighing process: "In [its] context, the word 'weighing' is a metaphor for a process which by nature is incapable of precise description. The word connotes a mental balancing process, but certainly not one which calls for a mere mechanical counting of factors on each side of the imaginary 'scale,' or the arbitrary assignment of 'weights' to any of them. Each juror is free to assign whatever moral or sympathetic value he deems appropriate to each and all of the various factors he is permitted to consider . . . ." (*Brown, supra,* 40 Cal.3d at p. 541.)

Our second concern was that the statutory language might mislead the jury as to the substance of the ultimate determination it was called on to make. Contrary to constitutional principles, that language "could be understood to require a juror (i) to determine whether 'the aggravating circumstances outweigh the mitigating circumstances' without regard to the juror's personal view as to the appropriate sentence, and then (ii) to impose a sentence of death if aggravation outweighs mitigation even if the juror does not personally believe death is the appropriate sentence under all the circumstances . . . ." (*People* v. *Allen* (1986) 42 Cal.3d 1222, 1277 [232 Cal.Rptr. 849, 729 P.2d 115].) In *Brown* we declared that the statutory language should rather be interpreted to require that the jury make " 'an individualized determination on the basis of the character of the individual and the circumstances of the crime' " (40 Cal.3d at p. 540, italics deleted),

and thereby decide "which penalty is appropriate in the particular case" (*id.* at p. 541).

We turn now to the case at bar. Contrary to defendant's claim, the prosecutor's closing argument was not such as to cause the jurors to entertain an erroneous belief about the scope of their sentencing discretion and responsibility. The argument was brief. Its theme was simple and proper: i.e., that whereas the evidence in aggravation was overwhelming, the evidence in mitigation was insignificant and therefore death was the "appropriate" penalty.

It is true that two remarks by the prosecutor may seem somewhat troublesome in the abstract. Specifically, at one point he suggested that if the aggravating factors predominated, the law "requires" the jurors to impose the death penalty. At another, he said: "This is a case where the scales are out of balance. The evidence in aggravation far exceeds any evidence in mitigation. Your decision is dictated by the law of the State of California. The decision under the evidence in this case is the imposition of the death penalty."

Viewed in context, however, these brief remarks are not likely to have confused the jury. As stated above, the consistent—and proper—theme of the prosecutor's argument was that the death penalty was appropriate for this defendant because of the evidence adduced, not because it was in any way "compelled" by "the law." Moreover, the prosecutor did not emphasize the apparently mandatory nature of the instruction. In these circumstances we cannot conclude that the jury may have been misled to defendant's prejudice by the section 190.3 instruction.[5]

## H

Next defendant contends his due process rights were violated when the court failed to instruct the jurors that they could impose the death penalty only if they were convinced *beyond a reasonable doubt* that the aggravating factors outweighed those in mitigation and that death was the

---

[5]Defendant also claims the court erred to his prejudice by refusing to give the following instruction: "In weighing the aggravating and mitigating factors, you are not merely to count numbers on either side. You are instructed, rather, to weigh and consider the factors. One mitigating circumstance may be sufficient to support a decision that death is not appropriate punishment in this case. The weight you give to any factor is for you individually to decide." The point must be rejected. Since our decision in *Brown* such an instruction has been proper. (See CALJIC No. 8.84.2 (1986 rev.).) For the reasons given above, however, the jury was not misled by the failure to give it in this case. Moreover, defense counsel was allowed to argue the substance of this instruction to the jury, in detail and without objection.

appropriate penalty. The point is without merit. (*People* v. *Allen, supra,* 42 Cal.3d at p. 1285.)

I

■ Defendant also maintains that the court's refusal to delete assertedly irrelevant mitigating factors from CALJIC No. 8.84.1 constituted reversible error.[6] Reading the list of aggravating and mitigating factors to the jury, however, is not in itself error. (*People* v. *Miranda* (1987) 44 Cal.3d 57, 104-105 [241 Cal.Rptr. 594, 744 P.2d 1127].)

Defendant argues that the prosecutor's listing of the factors during closing argument misled the jury by causing it to consider as aggravating evidence the absence of mitigating factors that were inapplicable to this case. Defendant fails in this attempt to bring his case within our holding in *People* v. *Davenport, supra,* 41 Cal.3d 247. In *Davenport* the prosecutor specifically argued that the absence of certain mitigating factors (§ 190.3, factors (d), (g), and (h)) showed the defendant acted calmly, deliberately, and of his own free will; in short, he presented the absence of a mitigating factor as an aggravating circumstance. The majority held this argument may have misled jurors as to the meaning of "aggravation" and "mitigation" under the statute. (41 Cal.3d at pp. 288-290.) By contrast, the prosecutor in the present case made no such argument; he merely reviewed each factor on the list and attempted to show that each was either absent or unimportant. At no point did he characterize the absence of mitigating factors as a factor in aggravation, and the jury could not reasonably have interpreted his brief comments about the inapplicable factors in that manner.

J

■ Defendant next contends the court erred in failing to inquire sua sponte into his mental competence at the penalty phase. (§ 1368, subd. (a).) Like his claim that the court erred in failing to instruct sua sponte on diminished capacity at the guilt phase, this point must be rejected on the ground that the record reflects no substantial evidence of mental incapacity warranting such action.

Although defendant's acts of murder, forced oral copulation, and rape were unquestionably brutal, they do not as a matter of law evince a "delusional flair" that compels the court to initiate an investigation into compe-

---

[6] Although defendant refers to the court's "refusal" to delete the disputed factors, the record does not reflect any request by defense counsel that the court do so. It would be more accurate to understand defendant's objecton as directed to the court's failure to omit the irrelevant factors sua sponte.

tence. As we observed in *People* v. *Laudermilk* (1967) 67 Cal.2d 272, 285 [61 Cal.Rptr. 644, 431 P.2d 228], "under the substantial evidence test . . . more is required to raise a doubt than mere bizarre actions [citation] or bizarre statements [citation] or statements of defense counsel that defendant is incapable of cooperating in his defense [citation] or psychiatric testimony that defendant is immature, dangerous, psychopathic, or homicidal or such diagnosis with little reference to defendant's ability to assist in his own defense [citation]."

Indeed, in the present case the court did appoint a psychiatrist who reported that defendant was sane at the time of the homicides and at the time of trial, and that in his view no psychiatric defense could reasonably be raised. Defense counsel agreed, commenting that defendant "is in fact more competent than practically any criminal defendant I have met." Moreover, defendant had demonstrated his capacity to defend himself capably with the aid of counsel at preliminary hearings concerning his criminal activities in jail, having subpoenaed witnesses, interviewed them, and prepared questions for use at the hearing.

Equally untenable is the claim that a capital defendant's desire for the death penalty in itself suffices to trigger an inquiry into competence, as we recently held on similar facts. (*People* v. *Guzman, supra, post,* pp. 915, 963-964.)

On the basis of the full record, we cannot conclude that the court committed error in permitting defense counsel to present his penalty defense without inquiring further into defendant's competence.

## K

■■■ Under our recent opinion in *People* v. *Balderas* (1985) 41 Cal.3d 144 [222 Cal.Rptr. 184, 711 P.2d 480], we must reject defendant's contentions that the court erred in admitting evidence of unadjudicated "other criminal activities" and evidence of criminal activities that occurred after the commission of the capital offense. We concluded in *Balderas* that such evidence of criminality, if proved beyond a reasonable doubt, may properly be considered by the jury in deciding the appropriate punishment for a capital offense. (*Id.* at pp. 205-206.) We also held that section 190.3, factor (b), imposes no time limit on the "violent" crimes that may be proved, observing that "the jury presumably may consider criminal violence which has occurred at any time in the defendant's life." (*Id.* at p. 202.)

## L

■■■ Defendant further maintains that the court erroneously refused to allow his counsel to end his closing statement to the jury by reading ex-

cerpts from a newspaper account of an actual execution in 1955. The court sustained the prosecutor's objection as counsel was about to begin his reading, and counsel completed his argument without further reference to the matter.

Defendant asserts that his counsel was entitled to wide latitude in closing argument. He adds that the manner in which an execution has been carried out is an appropriate subject for discussion under section 190.3, which expressly authorizes the admission of evidence "as to any matter relevant to . . . sentence." He insists that such a reading was a proper attempt to elicit sympathy for defendant while impressing on the jury the grim nature of the sentence the prosecution asked it to impose.

This court rejected an essentially identical argument in *People* v. *Harris, supra,* 28 Cal.3d 935, 962. There the trial court refused to admit similar evidence—the testimony of a former prison warden at San Quentin and of a television correspondent and courtroom artist, explaining in detail how an execution takes place. We sustained the ruling on the ground that such testimony had no bearing on the character or record of the individual offender or the circumstances of his particular offense, which are the proper focus of a penalty trial under *Woodson* v. *North Carolina* (1976) 428 U.S. 280, 304 [49 L.Ed.2d 944, 961]. A vivid account of an execution has no place at the penalty phase. Unlike mitigating evidence of a defendant's background and character, which may be introduced to elicit the sympathy or pity of the jury, accounts of the executions of others do not aid the jury in making an *individualized* assessment of the crucial issue whether the death penalty is appropriate for the particular defendant on trial.

Defendant's attempt to construe section 190.3 to require admission of such evidence is unconvincing. The relevant portion of the statute reads in full: "In the proceedings on the question of penalty, evidence may be presented by both the people and the defendant as to any matter relevant to aggravation, mitigation, and sentence including, but not limited to, the nature and circumstances of the present offense, any prior felony conviction or convictions whether or not such conviction or convictions involved a crime of violence, the presence or absence of other criminal activity by the defendant which involved the use or attempted use of force or violence or which involved the express or implied threat to use force or violence, and the defendant's character, background, history, mental condition and physical condition." Each of the specific items listed sheds light on the defendant himself and his particular actions. By contrast, an account of how an execution is conducted does not illuminate either the deeds or the character of the defendant before the court. Such an account, therefore, is irrelevant to aggravation, mitigation, or sentence, and as such is inadmissible.

## M

 Defendant also challenges the constitutionality of the 1978 death penalty statute both on its face—on the ground that it fails to meet the minimum standards established by the United States Supreme Court—and as applied to this case—on the ground that the sentence imposed on him was arbitrary, discriminatory, and disproportionate.

We reject the latter aspect of defendant's claim. As he submits no evidence that the sentence in his particular case was imposed either arbitrarily or discriminatorily, we treat the point as without substance.

Defendant's objections to the statute on its face are also unpersuasive: we continue to uphold the 1978 statute as constitutional. On the specific claim that the statute is defective because it fails to provide for proportionality review, the United States Supreme Court has upheld our determination that the lack of such a provision did not render the 1977 death penalty statute invalid. (*Pulley* v. *Harris* (1984) 465 U.S. 37 [79 L.Ed.2d 29, 104 S.Ct. 871].) The court expressly noted that its analysis applies equally to the current California statute. (*Id.* at p. 39, fn. 1 [79 L.Ed.2d at p. 33].) We have reached the same conclusion. (*People* v. *Allen, supra,* 42 Cal.3d 1222, 1285.)

### IV. HABEAS CORPUS ISSUES

In a petition for habeas corpus consolidated with this appeal, defendant contends he was denied effective assistance of counsel in violation of the federal and state Constitutions. (U.S. Const., 6th and 14th Amends.; Cal.Const., art. I, § 15.) He claims his counsel failed to adequately investigate or present evidence of his history of mental illness and drug abuse in defense of the charges of first degree murder or in mitigation of the penalty of death. He further charges that his counsel's failure to move to sever trial on the two murder counts deprived him of a fair hearing.

### A

 Defendant first charges that his trial counsel did not act in a reasonably diligent or competent manner because he assertedly failed to present any evidence of defendant's psychiatric or family history. Specifically, he insists that a reasonably competent attorney would have used the available psychiatric evidence in mitigation in the penalty phase, and would have further investigated defendant's psychiatric history as a source of a potential mental defense.

.Before trial, counsel obtained the complete record of several hospitalizations of defendant in 1970 and 1973, and arranged interviews with family members and friends. The records showed that defendant was twice placed in Creedmoor State Hospital in New York in 1970 by his mother. On the first occasion he was diagnosed as drug dependent, but was released after he was arrested for sitting in a stolen car during an unauthorized absence from the facility. He was readmitted a month later at his mother's request, after he had demonstrated a consistent desire to steal and tried to commit suicide. He was diagnosed that time as mentally retarded and drug dependent, and released a month later to the custody of the court. Two months thereafter he was again hospitalized, at Rockland State Hospital, and diagnosed as drug addicted and suffering from "chronic undifferentiated schizophrenia." Two months later he was described as "much improved" and diagnosed as being drug dependent and displaying an "adjustment reaction," and was again discharged to the custody of the court.

Defendant was hospitalized again in 1973, on referral from the court, to determine if he was capable of standing trial for kidnapping, robbery, grand larceny, criminal possession of stolen property, and unauthorized use of a motor vehicle. The medical reports varied, but he was repeatedly diagnosed as a "camouflaged" schizophrenic, and as drug dependent and suicidal. The record includes a history completed by his mother stating that he used numerous drugs and that in 1970 he committed sodomy on his brothers, then aged four and eight, keeping them quiet by threatening to throw them out of the window if they awakened her. After six months of hospitalization he was reported to be "recovered" and was released to the custody of the court.

On the basis of these reports, and after an investigator interviewed a friend of defendant and several relatives, counsel requested the appointment of a psychiatrist. After conducting a 17-hour study of defendant's mental condition, the psychiatrist submitted a written report concluding that no insanity or diminished capacity defense could reasonably be raised. The report stated there was no indication of delusional or psychotic symptoms leading to the killing of Forman, whom defendant described to the psychiatrist as "the meanest S.O.B. in the valley." Defendant denied killing Halbert; he said Forman did the deed, and suggested he killed Forman in retaliation. He also said he had feigned schizophrenia in 1970 and 1973, and he was "gaming" hospital personnel at that time in claiming not to understand the charges against him. And he said he had used "speed" before moving to northern California, and spoke of smoking marijuana and drinking beer daily in Shasta. He did not, however, describe any adverse symptoms from the drugs or relate their use to the homicides. After receiving the

psychiatric report, defense counsel decided not to present an insanity or diminished capacity defense at the guilt phase.

Defendant now urges that a mental defense was the only available defense, and that defense counsel was incompetent in failing to investigate his mental condition further. Neither of these claims is convincing.

First, in choosing not to rely on diminished capacity or insanity counsel did not abandon the defense. His strategy, rather, was to try to persuade the jury that the prosecution could not meet its heavy burden of proving beyond a reasonable doubt that the homicides of Forman and Halbert were premeditated. Since there were no witnesses to the killings the strategy was clearly viable. Indeed, although the plan proved unsuccessful as to the Halbert killing, it did result in a voluntary manslaughter verdict as to the Forman homicide, and hence in a finding that the multiple-murder allegation was not true.

Second, counsel had in fact diligently pursued the possibility of a diminished capacity defense by arranging for an investigator to interview relatives and friends of defendant and for a psychiatrist to undertake an evaluation of defendant's mental condition to determine if such a defense was feasible. Although counsel now states in a declaration that he found the physical appearance of the psychiatric report "shabby and unprofessional," it is clear that he also consulted with the psychiatrist and that the report itself was based on a lengthy study. Counsel does not indicate that he found the conclusions in the report inaccurate or untrustworthy; indeed, he states that it did not occur to him to consult a second psychiatrist. Moreover, counsel's own lay assessment at the time was that defendant was highly competent, and defendant himself denied insanity, claimed he had only feigned it in the past, and personally objected to a diminished capacity defense.

Defendant's present insistence that a second opinion would have yielded different results and warranted a diminished capacity defense is entirely speculative. The declaration of a psychiatrist who recently evaluated him for the purposes of the present petition does not convincingly establish otherwise. Although that psychiatrist determined from testing that defendant shows "elevated" results on the schizophrenia, mania, and psychopathic deviate scales of a standard test, he concedes the same test shows that defendant exaggerates his symptoms. According to the declaration, the same tendency to exaggerate appeared on the tests defendant took during his hospitalizations in the 1970's. At best, as the psychiatrist himself states,

the results are "partially" reliable. He adds that because it is now many years after the fact, his findings cannot be conclusive.

Although defendant now claims his medical reports from 1970 and 1973 reveal traits consistent with his later killings, they were clearly of limited value in themselves for preparing a diminished capacity defense. They were nearly seven years old at the time of the killings and included inconsistent diagnoses by a variety of hospital personnel, only some of whom were psychiatrists. Moreover, he had been released after the final hospitalization as "recovered" and capable of standing trial on theft, kidnapping, and robbery charges. The investigative reports, although sprinkled with words like "paranoid," "imaginary," and "delusion"—the jargon of laymen as well as the terminology of psychiatrists—showed defendant to be a brutal son, husband, friend, and nephew, but not obviously and unquestionably insane.

Similarly, counsel's decision to omit reference to the psychiatric reports at the penalty phase and not to present as witnesses defendant's mother, wife, aunt, and his—later Halbert's—former girlfriend, does not appear either incompetent or insufficiently diligent. Far from "humanizing" defendant, the testimony of these witnesses, as revealed in statements to the investigator, would have exposed him as an incorrigible youth who took drugs, stole, and sodomized his own younger brothers, a violent husband, and a nephew who caused his paraplegic aunt to live in "mortal fear" of his return. Rather than risk presenting such potentially damaging evidence in a futile effort to arouse sympathy, defense counsel followed the tactic of attempting to rebut aggravating evidence presented by the prosecution and then introducing witnesses to testify that defendant could be a good friend, a loyal and generous neighbor, and a man who lamented the lack of parents who cared about him and who regretted using drugs and alcohol. We conclude that this strategy constituted a choice well within the range of reasonable attorney competence. (*People* v. *Miranda, supra,* 44 Cal.3d 57, 118-123; *People* v. *Jackson, supra,* 28 Cal.3d 264, 290; *People* v. *Pope* (1979) 23 Cal.3d 412, 425-426 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].)

B

Defendant next urges that he was deprived of effective legal assistance by virtue of his counsel's failure to move for severance of the two murder counts. For defendant to prevail on the point, he must show that reasonably competent counsel would have moved for severance, that such motion would have been successful, and that had the counts been

severed an outcome more favorable to him was reasonably probable. (See generally *People* v. *Ledesma* (1987) 43 Cal.3d 171, 215-218 [233 Cal.Rptr. 404, 729 P.2d 839].)

Assuming arguendo that reasonably competent counsel would have moved to sever the two murder counts, we cannot conclude that defendant has carried his burden of showing that such a motion would have been successful. The statutory requirements for joinder were met, since the two murder charges were "two . . . different offenses of the same class." (§ 954.) And on this record defendant could not have made the clear showing of prejudice necessary to justify severance when joinder is permitted by statute. (*Williams* v. *Superior Court* (1984) 36 Cal.3d 441, 447 [204 Cal.Rptr. 700, 683 P.2d 699].) To begin with, there was considerable evidence common to, and hence cross-admissible on, the two charges. (See, e.g., *People* v. *Matson* (1974) 13 Cal.3d 35, 39 [117 Cal.Rptr. 664, 528 P.2d 752].) Witnesses connected defendant with both Halbert and Forman, and defendant's own admissions to Officer McDannold concerned both homicides. The crimes themselves were closely related: the victims disappeared during the same general period, they were killed by shots to the head by what may have been the same weapon, and they were buried in adjacent shallow graves on defendant's property. The similar method of killing and disposing of the bodies suggested a common modus operandi and would likely have been admissible as "other crimes" evidence in a severed trial to show the identity of the perpetrator. (Evid. Code, § 1101, subd. (b); *People* v. *Beamon* (1973) 8 Cal.3d 625, 633 [105 Cal.Rptr. 681, 504 P.2d 905]; *People* v. *Haston* (1968) 69 Cal.2d 233, 247 [70 Cal.Rptr. 419, 444 P.2d 91].)

This was not a case in which the relative strength of one charge bolstered the relative weakness of the other. (See, e.g., *People* v. *Smallwood* (1986) 42 Cal.3d 415, 429-430 [228 Cal.Rptr. 913, 722 P.2d 197].) Neither was one charge far more inflammatory than the other, so as to create a serious danger of prejudicing the jury against defendant. (See, e.g., *Coleman* v. *Superior Court* (1981) 116 Cal.App.3d 129, 138 [172 Cal.Rptr. 86].) On the other hand, trying the two cases together was expeditious in light of the common evidence, and avoided the "needless harassment of the defendant" (*Kellett* v. *Superior Court* (1966) 63 Cal.2d 822, 825-827 [48 Cal.Rptr. 366, 409 P.2d 206]) who not only did not express concern by demanding two trials, but vigorously attempted to plead guilty and avoid any trial at all.

Moreover, we cannot conclude that defendant has met his burden of showing that had the two murder counts been severed a more favorable outcome was reasonably probable. After a review of the entire record, we

believe that even if defendant had been given separate trials he would still have been convicted of murder and manslaughter and found to have previously suffered a murder conviction.

The judgment is affirmed. The petition for habeas corpus is denied.

Lucas, C. J., Broussard, J., Panelli, J., Arguelles, J., Eagleson, J., and Kaufman, J., concurred.

Appellant's petition for a rehearing was denied August 25, 1988, and the opinion was modified to read as printed above.