Filed 3/21/16  P. v. Shipley CA2/4
# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>   Plaintiff and Respondent,<br><br>   v.<br><br>SCOTT SHIPLEY,<br><br>   Defendant and Appellant. | B258095<br>(Los Angeles County<br> Super. Ct. No. MA059616)<br><br>ORDER MODIFYING OPINION<br>AND DENYING PETITION FOR<br>REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:*

It is ordered that the opinion filed herein on February 26, 2016, be modified as follows:

1.  On page 2, first full paragraph, second sentence, delete the word "third" and insert the word "second" in its place.

2.  On page 2, second full paragraph, third sentence, delete the words "and a continuance" and insert "and a further continuance" in their place.

3.  On page 23, Subsection heading b, delete the italicized words "*a Third,*" and insert the italicized word "*Another*" in their place.

4.  On page 23, second full paragraph, first sentence, delete the word "a" and insert "another" in its place.

5. On page 23, second full paragraph, second sentence, delete the words "had already twice been continued 98 days to give him time" and insert "scheduled for June 6 was continued to give him additional time" in their place.

These modifications effect no change in the judgment.

The petition for rehearing is denied.

_____

*EPSTEIN, P. J.          WILLHITE, J.          MANELLA, J.

Filed 2/26/16  P. v. Shipley CA2/4 (unmodified version)
**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>　　v.<br><br>SCOTT SHIPLEY,<br><br>　　　　Defendant and Appellant. | B258095<br><br>(Los Angeles County<br>　Super. Ct. No. MA059616) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Kathleen Blanchard, Judge.  Affirmed.

Ferrentino & Associates, Inc. and Correen Ferrentino for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr. and Tita Nguyen, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Scott Shipley appeals from the judgment following a jury trial in which he was convicted of second degree murder (Pen. Code, § 187, subd. (a)),[1] and the jury found true allegations that he personally and intentionally discharged a firearm causing great bodily injury (GBI) or death (§ 12022.53, subds. (b), (c) & (d).) Defendant's post-trial request to substitute newly retained counsel was denied, as was his third request to continue the sentencing hearing. Defendant was sentenced to prison for 40 years to life (15 years to life for the murder, plus a consecutive 25 years to life for the § 12022.53, subd. (d) [principal personally and intentionally discharged a firearm causing GBI/death] enhancement).[2]

Defendant maintains that the trial court erred in excluding medical records reflecting diagnoses and treatment he received while in custody for injuries he sustained during a fight with the victim that preceded the shooting. He further contends that the trial court committed reversible error in failing sua sponte to instruct the jury on the lesser included offense of involuntary manslaughter. Finally, defendant argues that the trial court erred in refusing his requests for substitute counsel of his choice and a continuance of the sentencing hearing. We find no error, and affirm the judgment.

## BACKGROUND

*The Prosecution's Evidence*

Decedent Chris Demyen owned the Acton Water Company (AWC) which, among other things, delivered water to fill home pools. Demyen was working

---

[1]    Unless otherwise specified, statutory references are to the Penal Code.

[2]    Sentences on the section 12022.53, subdivision (b) and (c) enhancements (10 and 20 years, respectively) were stayed under section 654.

from home on May 15, 2103.  His mother-in-law, Holly Hamilton, was present.  During early afternoon, Hamilton heard a man's voice leaving a message on Demyen's business phone.  Hamilton did not hear the whole message but told Demyen he should listen to it after hearing the man say he was "having a problem with one of [AWC's] drivers."  Later, Hamilton overheard Demyen taking on the phone saying, "Sir, sir, I'm trying to take care of the situation," after which he calmly left the house and drove away in his truck.

Aaron Tye was driving a large (semi) truck for AWC on May 15, 2013.  One of Tye's jobs that day was to fill a swimming pool at the home of Fernando Franco on Eagle Butte Road, a small road that dead-ends at defendant's house, up the hill from Franco's house.  At Franco's instruction, Tye parked the truck on the road as close as possible to the fence, set up and began pumping water to the pool.  About 10 minutes after Tye began filling Franco's pool, defendant drove up the road and stopped his white truck about 15 feet from the AWC truck.  Defendant's daughter Hollee, whom he had just picked up from school, sat in the passenger seat holding hot pizzas.  Franco, who was near his pool, heard loud voices coming from the truck, as if defendant was arguing with someone.

Tye had been sitting in the AWC truck while waiting for Franco's pool to fill.  When Tye saw defendant's truck, he realized it could not get past the AWC truck on the road and looked to see if there was somewhere he could move so defendant could get by.  Seeing no place to go, Tye walked toward defendant's truck, gesturing with his hands that he would be another 20 minutes.  Tye then returned to work, increasing the speed of the water flow to the pool.  After Tye resumed working, he occasionally looked at defendant and his daughter; he did not hear either one say anything.

3

About 15 minutes later, just as he was finishing up at Franco's house, Tye saw defendant and Hollee about 25 feet away, walking up the hill. He shouted out that he was "all done," and that defendant could "move [his] truck." Neither turned or responded; they kept walking. Tye put away the hoses and returned to the AWC truck which was unable to pass defendant's truck, which he had left in the middle of the road. Tye backed up and went to defendant's house, planning to apologize to for blocking the road and offer him a ride to his truck. No one answered Tye's knock.

When Tye got back to the AWC truck he saw a white truck he did not recognize pull up behind defendant's truck at the bottom of the hill. He saw someone he could not identify go in and out of defendant's truck, and heard a loud popping noise that sounded like a door slam. A few minutes later defendant drove up to the front of his house and parked. The other white truck still blocked the road at the bottom of the hill.

Franco, who had seen defendant and his daughter walking up the hill and heard Tye yell out that he was done, remained outside by his pool after Tye left. A few minutes later he saw Demyen pull up in his own truck a few feet behind defendant's truck, and get out. Demyen took tow straps with metal hooks on the end from his truck and laid them behind defendant's truck. As defendant approached, Demyen (who acted agitated or hostile) told him to "get [his] fuckin' truck out of the way." Franco heard defendant respond, but did not hear what he said. Franco testified that the men stood about two or three feet apart from one another; both appeared hostile. His view was partially obstructed by a fence and defendant's truck. Demyen told defendant he "need[ed] to move [his] truck," because he was "blocking [AWC's] service truck." Defendant responded to Demyen's demand by saying, "Hit me and you see what you gonna get." Demyen

4

told defendant again to move his truck and said that, if he did not, Demyen had the right to move it if it was blocking AWC's service truck. Demyen turned to grab the tow straps, and Franco saw defendant push him with both hands. Demyen—holding nothing in his hands—turned back and punched defendant "square in the face." Defendant returned the punch, but Franco was unable to see whether that punch connected. The men continued to punch one another. Franco did not believe either man gained the upper hand during the fight, but did see that defendant's nose was bleeding at some point. At one point, Franco saw defendant take out a gun, extend his hand straight out, aiming at the middle of Demyen's chest and shoot him, once. Demyen fell backward. Franco then ducked and went around the back of his house. A minute later, defendant came to Franco, saying "Something happened. Call the ambulance." Franco asked defendant to leave. Defendant repeatedly said "He hit me," as he left Franco, returned to his truck and drove away. Franco called 911, and went to help Demyen.

Meanwhile, as Tye made his way down the hill he saw someone lying face down on the ground whom he soon recognized as Demyen. After rolling Demyen over, Tye saw a bullet hole and that his shirt was covered in blood. He began performing CPR. He stopped when he could not feel a pulse or breath, moved Demyen's truck so the paramedics could get to him and, when the police arrived told them he believed defendant—then walking down the hill—was the shooter.

Defendant's daughter, Hollee, testified that her father picked her up from high school at about 12:30 p.m., on May 15, and they bought pizzas. On their street they found the AWC truck blocking the road. Hollee and her father noticed that the truck's water hose was "kinked," which they surmised kept the water from flowing as fast as it should. She took photos of the truck and hose. Hollee was a "little upset" because the pizzas were hot on her legs, and defendant was "a little

5

bit irritable" for the same reason, but not angry. He used the experience to educate Hollee about water trucks.

Defendant called the number on the AWC truck from his cell phone. He told the person who answered that the driver had indicated it would take about 20 minutes for him to finish, explained that it would be faster without the kinks and that since Franco had a large gate through which AWC's truck could move, it had blocked the road unnecessarily. Defendant hung up after a brief silence. He told Hollee that Demyen had said he knew about the gate, but 20 minutes was a normal amount of time to fill a pool. Hollee said her father seemed confused, not upset. Defendant then received a call from AWC, but was unable to say anything because he kept being interrupted. After that call defendant "seemed slightly irritated, because his story was not being heard." He then received another call from AWC, during which defendant told the caller he planned to walk home and leave his truck behind for two hours, and hung up.

As Hollee and defendant walked up the hill to their house, he talked to her about how "weird" the situation was, but was not angry. At one point he remarked that, "if you mess with me, I'm gonna mess with you." Hollee heard Tye call out that he was "done here," but neither she nor defendant turned around or spoke to him. Defendant got angrier as they walked up the hill, but seemed calmer by the time they got home.

Defendant's son, James, was home when he and Hollee arrived sometime after 1:15 p.m. James thought his father seemed tired and somewhat frustrated. Hollee briefly explained to James what had happened, then went outside to take photos of the truck blocking the road. As she did, she saw the AWC truck backing up the hill toward their house and went inside. Defendant told his children he was going to get his truck, and not to open the door for anyone. He left through a door

opposite the road. Defendant did not mention a gun, and Hollee did not see one. James knew his father owned a .38 caliber handgun. Hollee heard knocking on the door about five minutes after defendant left, but neither she nor James answered the door.

Defendant returned to the house in his truck. When defendant came into the house, Hollee and James saw immediately that his nose and shirt were covered in blood. Defendant instructed the children to call their mother. He said it was an "emergency," and that he had "just shot somebody" and went into his room. Defendant emerged a few moments later having washed the blood off his face, and had Hollee take his picture. He was "frantic" and panicked, kept repeating himself and seemed to be "trying to get his thoughts together."

Defendant asked his children to accompany him down the hill. As they headed down they saw several police cars headed toward their house. Hollee was interviewed twice by representatives from the Los Angeles Sheriff's Department (LASD). LASD Deputy Timothy Lovitt and Sergeant Howard Cooper interviewed her at the scene. Deputy Lovitt described her as calm, not shaken or upset. She told him defendant had been very angry when he saw the AWC truck blocking the road, while defendant was on the phone with AWC. She had heard Tye shout that he was done pumping water into Franco's pool, but chose to ignore him.

Sergeant Cooper interviewed Hollee and James later that day at the sheriff's station. During her interview, Hollee referred several times to the fact that defendant was specifically angry about the kinks in Tye's water hose.

An LASD Detective conducting the investigation observed several feet of uncoiled tow strap lying on the ground with metal hooks at each end. Close examination revealed no blood on either the strap or its hooks. Inside defendant's

7

house, investigators found a locked gun safe in defendant's closet with an unloaded revolver on top, but no ammunition or expended cartridges.

The medical examiner who performed Demyen's autopsy opined that he died of a gunshot wound to his chest. Demyen had some external abrasions on his forehead, lower legs, knees and left arm, and blunt force injuries to his head and extremities. The coroner opined that Demyen received these injuries at or near the time of his death. "Powder stippling" around the gunshot wound suggested that the distance between the gun barrel and Demyen's chest was about "two and a half to three feet."

*The Defense Evidence*

Defendant testified in his own defense. Defendant lived on Eagle Butte Road, where the road ends. On May 15, 2013, he was driving up the road with his daughter Hollee, after picking her up from school. An AWC water truck servicing Franco's pool blocked the road his family shared with Franco. The truck's hose, draped over Franco's fence, was "kinked" in two places spraying water everywhere. Defendant talked to Hollee about how inefficient the delivery system was and how rude the driver had been to block the road. Eventually, the driver came around defendant's truck signaling that he would be another 20 minutes. Defendant did not want to wait that long and shouted at him to straighten the hose; the driver did not acknowledge him.

Defendant called AWC and, as he was leaving a message, Demyen answered the phone. Demyen acknowledged that he knew his driver was blocking defendant's access. When defendant tried to tell Demyen that AWC's delivery system was inefficient because the hose was kinked and offered to send a photo, Demyen got indignant, acting as though defendant was telling him how to run his

8

business. Demyen was equally unreceptive when defendant tried to explain that the truck did not need to block the road; it could have gone through Franco's double gate. He ranted and called defendant a "fucking asshole." Offended and insulted, defendant hung up, but Demyen called back and continued to rant. Defendant described Demyen as being "almost incoherent, out of control," and said he just went "on and on and on." Defendant was not able to say anything, and eventually hung up again. When Demyen called back again, defendant told him he planned to "leave [his] truck [there] a couple of hours to give [AWC] time to do [its] job." Defendant was offended and insulted, but "not upset with the truck driver or anything." Defendant did not hear Tye shout as he and Hollee walked up the hill to their house. If he had heard the driver say he was done, defendant would have gone back to retrieve his truck. As they walked, defendant told Hollee that Demyen said something to him to the effect that, "if you mess with me, I'm going to mess with you."

When they got home, defendant put on jeans, removed a small revolver from his gun safe (which he always carried at home because of past encounters with wild animals), and put the gun in his pocket. He heard the AWC truck backing up, and told his children not to open the door. Wishing to avoid Tye, whom he described as "surly," defendant took a different route down the hill.

As he arrived back at his truck, defendant saw a truck stop abruptly behind his own. A man he learned later was Demyen got out holding a tow hook in a "fisted grip," with the strap loosely rolled in the other hand. He told defendant, "you mother-fucker, move that fucking piece of shit. I'm going to fuck you up and kill you." Demyen moved behind defendant's truck, squatting out of sight. As defendant came around the back of his truck to see what Demyen was doing, he

9

heard metal clanging and Demyen told him he could take the truck anywhere he wanted. Defendant told him not to take his truck.

Demyen grabbed defendant's shirt with his left hand and, with his right hand, struck defendant repeatedly on the left side of his face with the tow hook along his eye line and orbital. Defendant heard his bones break, turned his head and Demyen struck him on the ear with the hook. Demyen, who was bigger than defendant, continued to hit him in the face with the hook over and over. Defendant did nothing to defend himself, and tried only to avoid being struck and to shield himself. Soon defendant began to believe that Demyen would never stop and was intent on carrying out his earlier threat. After Demyen hit the bridge of defendant's nose and he heard a crunching sound and felt his nose flatten into his face, defendant "drew [his] revolver and shot [Demyen]" from about two or three inches away. He was not trying to kill Demyen, just stop the aggression. Defendant tried calling for help, but was unable to control the buttons on his phone. After a while he found Franco and told him to "call 911." When Franco asked "why?," defendant told him that Demyen had "just tried to kill [him] with that tow hook." He told Franco to "get an ambulance," and walked back to his truck and drove home.

When he got home, defendant rinsed off his face, asked his children to take pictures of his injuries and the blood, unloaded the gun and put the ammunition in an outside shed. When defendant took his gun out on May 15, 2013, he did not do so intending to shoot anyone, had not known Demyen would show up, denied knowing that Demyen would confront him or that he intended to goad him. Defendant testified he did not intend to kill Demyen. In a number of recorded jailhouse phone calls to and from his family, defendant had referred to himself as a "high-profile father," a "celebrity," and said he was "truly a celebrity [in the

10

jail]," and acknowledged "that's great. . . . [He] love[d] the attention, the celebrity, [and] the high-profile nature that this case brought [him]."

## DISCUSSION

Defendant contends the trial court erred by (1) refusing to admit his medical records proffered to corroborate his fear that he was in imminent danger of suffering great bodily injury or death, and that he did in fact suffer great bodily injury at Demyen's hands; (2) refusing to instruct the jury on the lesser included offense of involuntary manslaughter; and (3) denying his request for a continuance to permit his newly retained counsel to research, prepare and present a motion seeking a new trial.

1.    *The Trial Court Did Not Err in Excluding Defendant's Medical Records*

Defendant asserts that the trial court violated his Fifth and Sixth Amendment rights by excluding his medical records as irrelevant and under Evidence Code section 352 (section 352). He maintains that the excluded records are the only corroborative evidence of the degree of force required under the circumstances and the reasonableness of his claim that he acted in self-defense. We conclude otherwise.

a.    *Relevant Proceedings*

After it rested and before defendant presented his case, the prosecution moved "to exclude any mention of any of the diagnoses that the defendant [had] gotten during the course of his time in jail," on the ground that such information was irrelevant to his state of mind at the time of his encounter with Demyen, and should be excluded under section 352. Before ruling, the court confirmed with

11

defendant its understanding that the information he sought to elicit from those records was related to "side effects of the injuries [he] sustained in the fight that preceded the shooting," and his subsequent "pain and suffering . . . or any treatment or diagnosis."

Defendant's counsel noted that the records would show that long-term effects of the injuries included a need for glasses (never before worn) due to a loss of peripheral vision, hearing loss in one ear, tremors and that his nose had been broken in two places. Counsel argued the records were "indicative of great bodily injury and would . . . satisfy the component" of defendant's claim of self-defense that he had "reasonably believed that he was in imminent danger of being killed or suffering great bodily injury," and the jury was entitled to know the physical symptoms defendant experienced as a result of Demyen's "attack . . . upon him." Defendant's counsel argued that he should also be permitted to testify about injuries he suffered at the time of his confrontation with Demyen.

The court agreed that evidence of defendant's broken nose and other symptoms or injuries suffered contemporaneous with the incident itself was admissible. Photographs depicting a substantial amount of blood on defendant's clothing, and evidence that his nose was broken and bloodied was relevant to defendant's mindset at the time. Similarly, if defendant were to testify that his vision had become blurry or that he had been unable to hear anything as or just after being punched, such evidence would be relevant because it was "contemporaneous to the incident itself" and went to his "mindset at the time." To that end, the court permitted defendant to introduce a photograph taken of him at the jail three days after the incident depicting him with two black eyes. It explained that, if defendant planned "to testify about his version of events, . . . that

12

photograph [was] relevan[t] . . . because it is corroborative evidence as to his testimony."

By contrast, the court found that medical records reflecting long-term effects that defendant suffered, or his diagnoses and treatment while in custody were not relevant to the pivotal question of the existence and reasonableness of his belief that he was in imminent danger at the time of the incident:

> " . . . and whether we're talking about perfect self-defense or imperfect self-defense, what the jury has to look at is whether the defendant had an actual belief and whether that belief was reasonable. Those are the two elements . . . that separate those two things, perfect from imperfect, and also justify or excuse the homicide. [¶ ] What injuries are actually sustained or the long-term effects thereof are really irrelevant."

The court also excluded the medical records and testimony regarding after effects defendant suffered due to his confrontation with Demyen on the ground that the "strong prejudicial effect" of such evidence "would substantially outweigh [its] minimal probative value" under section 352, and such evidence was "really only elicited to play on the sympathy of the jury that . . . defendant has suffered enough." Moreover, such evidence would tend to "confuse the issues" and cause an "undue consumption of time" by requiring the court to delve into the "after-effects" of injuries sustained, none of which was relevant either "as to what happened" at the time of the incident or as "to anything the jury need[ed] to decide."

b.    *The Court Did Not Err in Excluding the Medical Records*

A trial court's decision to admit or exclude evidence under section 352 is reviewed for abuse of discretion. (*People v. Jenkins* (2000) 22 Cal.4th 900, 1008 (*Jenkins*).) The court has substantial discretion in this respect and its exercise of

discretion will not be disturbed on appeal absent a showing that it was exercised in an arbitrary, capricious, or patently absurd manner resulting in a manifest miscarriage of justice. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124 (*Rodrigues*).) Only relevant evidence is admissible. (Evid. Code, § 350.) Relevant evidence is that which has a tendency to prove or disprove a disputed fact and is of consequence to the determination of the action. (Evid. Code, § 210.) Under section 352, a court may exclude even relevant "evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (§ 352, subds. (a), (b).)

Defendant argues that his medical records should not have been excluded because they constitute the "only evidence that could corroborate [his] testimony of his injuries and the force used by Demyen to support [his] claim of self defense," and the trial court did not engage in the requisite balancing of the probative value of this evidence against its prejudicial effect. Neither contention is correct.

First, defendant's claim to the contrary notwithstanding, the court did not exclude all evidence that may have corroborated his claim of self-defense. Defendant himself testified at length that Demyen had attacked him, that he did nothing to respond until he acted in self-defense after it became clear that Demyen meant to make good on his threat to kill him. He testified that Demyen was his physical superior, and about numerous blows Demyen delivered to his face with a metal tow hook. He recounted and described a procedure performed on his nose after Demyen broke it in two places, presented photographic evidence corroborating that testimony, and testified about side effects he suffered.

14

Defendant's children also described their observations of their father's bleeding face and bloodied clothing after his encounter with Demyen. And defendant's neighbor Franco, a disinterested third party and the only eyewitness to the deadly confrontation, testified about Demyen's hostility from the outset and about seeing him punch the smaller man "square in the face," and continue to punch him several times, and about defendant saying that Demyen had "just tried to kill [him]" when he asked Franco to call 911.

Second, there is no support for defendant's claim that "[n]othing in the record establishes that the court ever weighed the probative value of th[e proffered] evidence against any prejudicial effect and found that the probative value was substantially outweighed by any prejudicial effect." (AOB 34)~ As discussed above, the record clearly reflects that the court carefully weighed any minimal probative value the medical records might have against the potential prejudice of presenting such evidence to the jury, and reached the conclusion that the "strong prejudicial effect [of such evidence] substantially outweigh[ed] any minimal probative value."

Third, even if defendant could demonstrate that the long-term medical problems about which he complains actually resulted from the confrontation with Demyen *and* had some bearing on his mindset at the time of the incident itself, the court appropriately concluded that the probative value of such evidence was minimal at best, particularly when compared to the risk that such evidence would complicate matters, confuse the jury and result in an undue consumption of time.[3]

---

[3] For example, without testimony from a medical expert linking his long-term injuries to the incident, defendant's assertions were mere speculation. But, if defendant were permitted to present such expert testimony, the prosecution would have to present an expert of its own, resulting in an unwarranted consumption of time spent litigating the cause of defendant's injuries, an issue the jury was not required to resolve.

15

In sum, defendant failed to show that the trial court abused its discretion by excluding medical records of diagnoses and treatment he received while in custody after Demyen's death.

2.  *The Trial Court Did Not Err by Failing to Instruct on Involuntary Manslaughter as a Lesser Included Offense of Murder*

The jury was instructed, among other things, as to first and second degree murder, killing in self-defense—both reasonable and unreasonable—and voluntary manslaughter. Defendant did not request, and the trial court did not give, an instruction on involuntary manslaughter. The jury found defendant guilty of second degree murder. He maintains the trial court had a duty to instruct the jury sua sponte on involuntary manslaughter as a lesser included offense of murder, and that its failure to do so constitutes reversible error. We conclude that this instruction was not warranted by the evidence.

a.  *The Standard of Review*

"The trial court has a duty to instruct the jury sua sponte on all lesser included offenses if there is substantial evidence from which a jury can reasonably conclude the defendant committed the lesser, uncharged offense, but not the greater." (*People v. Brothers* (2015) 236 Cal.App.4th 24, 29 (*Brothers*), citing *People v. Whalen* (2013) 56 Cal.4th 1, 68, disapproved on another point by *People v. Romero and Self* (2015) 62 Cal.4th 1, 44, fn. 17.) The duty to instruct on a lesser included offense does not arise unless there is substantial evidence from which the jury could find that the lesser offense, but not the greater, was committed. (*People v. Breverman* (1998) 19 Cal.4th 142, 162 (*Breverman*),

16

abrogated on another ground by amendment–not relevant here ("[t]o prove the killing was 'deliberate and premeditated,' it shall not be necessary to prove the defendant maturely and meaningfully reflected upon the gravity of his or her act")– of § 189.)  "Evidence is 'substantial' only if a reasonable jury could find it persuasive."  (*People v. Young* (2005) 34 Cal.4th 1149, 1200.)  "'[T]he existence of "*any* evidence, no matter how weak" will not justify instructions on a lesser included offense[;] . . . such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is "substantial enough to merit consideration" by the jury.'"  (*People v. Moye* (2009) 47 Cal.4th 537, 553 (*Moye*).)  "We review the trial court's failure to instruct on a lesser included offense de novo [citations] considering the evidence in the light most favorable to the defendant [citations]."  (*Brothers, supra,*  236 Cal.App.4th at p. 30; *People v. Walker* (2015) 237 Cal.App.4th 111, 115.)

b. *Involuntary Manslaughter as a Lesser Included Offense of Murder*

Murder is the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a).)  Malice may be express or implied.  (§ 188.)  Express malice is an intent to kill; implied malice is shown by a willful act the natural and probable consequences of which are dangerous to human life where the actor knowingly acts with conscious disregard for the danger to life.  (§ 188; *People v. Beltran* (2013) 56 Cal.4th 935, 941–942.)  First degree murder is a killing with express malice that is willful, deliberate, and premeditated.  (*Id*. at p. 942.)  Second degree murder is an unlawful killing with malice aforethought, but without the willfulness, premeditation, or deliberation necessary to support first degree murder.  (*Ibid*.) Voluntary and involuntary manslaughter are lesser included offenses of murder. (*People v. Thomas* (2012) 53 Cal.4th 771, 813.)  "A defendant commits voluntary

17

manslaughter when a homicide that is committed either with intent to kill or with conscious disregard for life—and therefore would normally constitute murder—is nevertheless reduced or mitigated to manslaughter." (*People v. Bryant* (2013) 56 Cal.4th 959, 968.) The mitigating circumstances involves some form of provocation or imperfect self-defense. (*Ibid*.) Involuntary manslaughter, on the other hand, is a killing that occurs "in the commission of an unlawful act, not amounting to a felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." (§ 192, subd. (b); see *People v. Burroughs* (1984) 35 Cal.3d 824, 835, disagreed with on another ground in *People v. Blakeley* (2000) 23 Cal.4th 82, 88–91 (*Blakeley*).)

The trial court has a duty to instruct on involuntary manslaughter whenever there is substantial evidence indicating the defendant did not actually form the intent to kill. (*People v. Rogers* (2006) 39 Cal.4th 826, 884 (*Rogers*).) In this context, "substantial evidence" is "'""evidence from which a jury composed of reasonable [persons] could . . . conclude[ ]'"" that the lesser offense, but not the greater, was committed.'" (*Moye, supra*, 47 Cal.4th at p. 553.) "'""Speculation is an insufficient basis upon which to require the giving of an instruction on a lesser included offense.""'" (*People v. Valdez* (2004) 32 Cal.4th 73, 116.) Here, speculation is all defendant offers. He maintains that his testimony constitutes substantial evidence to warrant an instruction on involuntary manslaughter. However, that testimony is not sufficient evidence to suggest that defendant did not act with implied malice. Thus, the evidence did not justify an instruction on involuntary manslaughter. (*People v. Wickersham* (1982) 32 Cal.3d 307, 323–324, overruled on another ground by *People v. Barton* (1995) 12 Cal.4th 186, 201.)

Defendant's reliance on *People v. Welch* (1982) 137 Cal.App.3d 834 (*Welch*), is misplaced. In *Welch,* the court found there was "substantial evidence

18

from which a jury could conclude that the defendant did not intend to kill [the victim] when he discharged his weapon." (*Id*. at p. 840.) However, as the Supreme Court explained in *Blakeley*, *supra*, 23 Cal.4th 82, which effectively abrogated *Welch*, the *Welch* court failed to "engage in any analysis or cite any authority" to support its conclusion that an unintentional killing in unreasonable self-defense can only be involuntary manslaughter, and the case is not "persuasive authority for the proposition that intent to kill is necessary for a voluntary manslaughter conviction." (23 Cal.4th at pp. 90-92.) Here, although the jury was instructed on voluntary manslaughter, it convicted defendant of second degree murder. A necessary implication of the jury's rejection of voluntary manslaughter is its conclusion that defendant acted with malice (intended to kill Demyen or with conscious disregard for his life), coupled with its finding that defendant's acts were not taken in response to sufficient provocation by Demyen nor in unreasonable self-defense. Those conclusions preclude a finding of involuntary manslaughter. (See *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1145 (*Gutierrez*) [involuntary manslaughter instruction unwarranted where undisputed evidence established shooting was intentional, although prosecution and defense witnesses disagreed on precipitating event, and jury's rejection of manslaughter in favor of murder verdict precluded possibility of error in refusal to instruct on involuntary manslaughter].)

Here, as in *Gutierrez*, defendant's actions were neither unintentional nor merely negligent. Rather, they were clearly intentional and there was overwhelming evidence of his conscious disregard for Demyen's life. (*Brothers*, *supra*, 236 Cal.App.4th at pp. 34-35; *People v. Guillen* (2014) 227 Cal.App.4th 934, 1028 [involuntary manslaughter instruction unwarranted where evidence left no room for reasonable doubt that defendant acted with intent to kill or conscious disregard for human life]; see generally *People v. Evers* (1992) 10 Cal.App.4th

19

588, 596, 598 (*Evers*) [intentional use of violent force against the victim, knowing the probable consequences of actions, precludes instruction on involuntary manslaughter].) The record contains no evidence suggesting that defendant did not fully appreciate the risk of his actions. A sua sponte involuntary manslaughter instruction is not warranted in the absence of substantial—not "minimal or insubstantial"—evidence that a defendant acted without realizing his conduct posed a risk to human life. (*Id*. at p. 596.) Even viewing the evidence in the light most favorable to defendant, as we must, there is no substantial evidence to warrant an instruction on involuntary manslaughter. (See *Moye, supra*, 47 Cal.4th at p. 553; *Brothers, supra*, 236 Cal.App.4th at pp. 30, 33-35.)

3.     *The Court Did Not Abuse its Discretion by Denying Defendant's Request for a Continuance*

     a.     *Relevant Proceedings*

After the jury returned its verdict on April 25, 2014, the trial court granted defendant's request to postpone the sentencing hearing until June 6, 2014.

When the parties returned on June 6, 2014, defendant was still represented by the same privately retained counsel who had represented him at trial. On that day, the trial court granted defendant's second request to continue the sentencing hearing, which was set for August 1, 2014. Although there is no transcript of the hearing in the record, the trial court later noted—and no party disputes—that it informed the parties on June 6, that no further continuances would be permitted.

On August 1, 2014, defendant appeared with Mark Bledstein, an attorney from the office of his then-current counsel, and Correen Ferrentino, prospective counsel whom he wished to substitute in. Ferrentino informed the court that, on July 15, 2014, she had filed a motion to continue the sentencing hearing, and that

she had been "retained [by defendant] a couple weeks before that." Ferrentino wished to substitute in as defendant's counsel of record in order to evaluate the transcripts and evidence to determine the grounds (if any) for a new trial motion, to file that motion and for sentencing. She said she had informed trial counsel several weeks before of her "intention[] to substitute in . . . and to continue the matter to obtain transcripts and to investigate any issues for motions new trial both within the record and outside the record." Ferrentino also reminded the court that it was a "critical stage" of the proceeding for purposes of a new trial motion which could not be filed after sentencing, and that defendant faced a severe sentence notwithstanding his lack of prior convictions.

The court rejected defendant's request for a continuance for several reasons. First, it noted that the verdict had been rendered 99-days earlier. To permit new counsel at such a late stage to substitute in and conduct an additional three months' of investigation which might or might not lead to the filing a new trial motion violated section 1191's principle requiring speedy sentencing and caused additional, unnecessary suffering to the victim's family who deserved and had waited a long time for their "day in court, . . . peace of mind and finality."

Second, the court observed there was a "very serious" public interest in denying an additional continuance because, although defendant faced a lengthy prison sentence by virtue of his murder conviction, he remained housed in a county jail which was "bursting [at] the seams . . . with . . . state prisoners . . . being housed locally."

Third, the court reminded defendant's current counsel that, when the parties appeared at the prior sentencing hearing and defendant requested a second continuance, the court agreed to delay sentencing a second time to August 1, but specifically said that it "wasn't going to grant any further continuances; that we

21

needed finality of judgment and we needed to get this done"; and that it knew "that everyone understood that."[4]

Despite the court's pronouncement,

"It wasn't until after that June 6th date that [defendant] employed another attorney . . . [who] . . . says that she was retained by [defendant's] family on June 9. So that was three days after the first continuance where I made clear I wasn't going to grant anymore continuances.

"Despite being retained on June 9th, I did not get a motion to continue from counsel until it was filed on July 15th."

In addition, the court noted that defendant's then-current counsel and the prosecutor both approached the trial court a few days before the August 1 hearing to inquire whether it was

" . . . 'inclined to grant [the instant request for a] continuance?' [The court] said absolutely not, as I made clear before, we're going forward on sentencing [on August 1]. So I also don't believe that it in any way prejudices [defendant] and his current attorney to go forward with sentencing today, because everyone knew that that was going on and everyone knew that I was not going to be granting a continuance."

Finally, the court noted that, although defendant had a right to be represented by an attorney of his choosing, that right was "not absolute" and he could not, "by insisting on a particular attorney, unnecessarily impede or obstruct the progress of the proceedings," which is what the court perceived defendant to be attempting to do ("that's what we have here"). (See *People v. Robertson* (1963) 222 Cal.App.2d 602, 605-606.)

The court found that, although defendant had known since June 6, 2014, that no further continuances would be granted, he had been "dilatory" and had waited

---

**4** There is no reporter's transcript for a June 6, 2014, hearing. There is also no dispute that the discussion to which the trial court referred took place.

22

until three days after the court stated that no further continuances would be given to retain new counsel. That new counsel had now informed the court she needed three more months to conduct her review and investigation, and there was no guarantee that, at the end of that time, a new trial motion would be filed. Accordingly, the court found no good cause to continue sentencing. The court was willing to grant defendant's request to substitute counsel, provided Ferrentino was prepared to proceed immediately with sentencing. After the court was informed that defendant's counsel was not ready to proceed with sentencing, it denied defendant's request for substitution of counsel and to continue the sentencing hearing.

b. *Defendant Has Not Demonstrated that the Trial Court Erred in Denying a Third Continuance of the Sentencing Hearing*

A continuance may be granted for good cause (§ 1050, subd. (e)), and the trial court has broad discretion to grant or deny the request. (*People v. Grant* (1988) 45 Cal.3d 829, 844.) A continuance may be denied if a defendant "is 'unjustifiably dilatory' in obtaining counsel" or "'arbitrarily chooses to substitute counsel at the time of trial.'" (*People v. Courts* (1985) 37 Cal.3d 784, 790.) Defendant bears the burden to establish that the court abused its discretion. (*People v. Rhines* (1982) 131 Cal.App.3d 498, 506.)

Here, the trial court did not abuse its discretion in denying a continuance having found defendant was dilatory and failed to demonstrate good cause for a continuance. At defendant's request, the sentencing hearing had already twice been continued 98 days, to give him time to prepare for that hearing and/or file post-trial motions. Counsel had specifically been informed by the court on June 6, that the sentencing hearing would take place on August 1, 2014. Ferrentino was

retained on June 9, 2014, but did not alert the court until August 1 that she needed two or three more months just to determine whether defendant had grounds to file and to file a new trial motion. Ferrentino did not inform the court that she had uncovered any information in the intervening nearly two months before the August 1 hearing to lead her to believe such a motion would indeed be filed.

Further, our review of the record and disposition of the other issues defendant has raised on appeal convinces us that, even if a continuance should have been granted, defendant had no grounds upon which to base a new trial motion. Thus, to the extent the court erred in denying a continuance, the error was harmless.

Defendant maintains that, had his new attorney been given more time to research and prepare a new trial motion, "he would have had an opportunity to seek two vital expert opinions": the first to review and interpret his medical records, and the second regarding the effect of marijuana in Demyen's system. First, as discussed at section 1, above, defendant's contention that the trial court erred in excluding medical records of diagnoses and treatment he received in custody lacks merit.

We also reject defendant's claim that, had he been given additional time he could have obtained an expert to testify regarding the amount and effect of marijuana found in Demyen's system when he died.[5] Defendant claims that, had he been able to conduct further investigation, such an expert's opinion might have been deemed essential either to his claim of self-defense, or to an argument that he received ineffective assistance of counsel because his trial counsel neglected to seek and present such expert evidence to corroborate his testimony. First, we fail

---

**5** Before trial, when the prosecutor objected to introduction of this evidence, defendant's attorney responded that he had no intention of introducing it, so the issue became moot.

to see the relevance of evidence that Demyen had marijuana in his system at the time of the incident. The jury heard—and rejected—defendant's testimony that Demyen verbally threatened his life, then engaged in an unprovoked attack, repeatedly striking defendant in the face with a metal tow hook, an attack so savage that defendant believed Demyen actually intended to kill him. Additional evidence that *Demyen* had cannabis in his system at the time all this occurred does not bear on *defendant's* state of mind at the time when he decided to shoot him.

Further, defendant has identified nothing that would advance any claim of ineffective assistance of counsel. Where, as here, the record on appeal sheds no light on why counsel acted or failed to act in a challenged manner, in order to avoid placing appellate courts in "'the perilous process of second-guessing," or ordering unnecessary reversals in cases "where there were, in fact, good reasons for the aspect of counsel's representation under attack," the proper approach is for appellate counsel wishing "to raise the issue of inadequate trial representation [to] join a verified petition for habeas corpus." (See *People v. Pope* (1979) 23 Cal.3d 412, 426–427, fn. 17, abrogated on another ground by *People v. Ledesma* (1987) 43 Cal.3d 171, 217–218.)

Here, we cannot ascertain why defendant's trial attorneys chose not to pursue the issue of the presence and/or level of drugs in the victim's system. To the extent defendant's new counsel—who has had since mid-June 2014 to consider this issue, believes such an argument may legitimately be made on this point, it may be presented in a habeas corpus petition.

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**



WILLHITE, J.



We concur:



EPSTEIN, P. J.



MANELLA, J.

26