Filed 2/28/22  P. v. Coleman CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>v.<br><br>WENDELL COLEMAN, JR.,<br><br>　　　　Defendant and Appellant. | A159933<br><br>(Napa County<br>Super. Ct. Nos.<br>CR183644, CR183654 &<br>CR184602) |

Defendant Wendell Coleman, Jr., appeals from a judgment of conviction, following a jury trial, of one count of corporal injury to a cohabitant, one count of false imprisonment with violence, and three counts of disobeying a court order. On appeal, defendant contends: the trial court violated his Sixth Amendment rights by denying his *Faretta*[1] motion and in refusing to grant a continuance to retain counsel; erred in instructing the jury—pursuant to CALCRIM No. 361—that it could draw an unfavorable inference from his failure to explain or deny all of the evidence against him; and erred in including his daughter in the stay-away order.

We affirm but order the trial court to correct the stay-away order in accordance with this opinion.

---

[1] *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*).

1

After a domestic violence incident in May 2017, the Napa County District Attorney filed an information against defendant alleging one count of felony corporal injury against a cohabitant (Pen. Code, § 273.5),[3] and one count of felony false imprisonment by violence (§ 236).  The information also alleged that defendant disobeyed a subsequent domestic relations court order on three separate occasions resulting in three counts of misdemeanor disobeying a court order (§ 273.6, subd. (a)), and that two months after the domestic violence incident, defendant committed one count of felony second degree burglary (§§ 459, 460), one count of felony grand theft (§ 487, subd. (a)), and one count of misdemeanor vandalism (§ 594, subd. (b)(2)).  It was additionally alleged that defendant committed the burglary and grand theft counts while out on bail (§ 12022.1).

The jury found defendant guilty of corporal injury to a cohabitant, false imprisonment, the three counts of disobeying a court order, and vandalism, but not guilty of the two remaining counts.  The trial court suspended imposition of sentence and placed defendant on five years' probation subject to certain terms and conditions.

## DISCUSSION

### Sixth Amendment Violations

#### Faretta *Motion*

At an April 2018 hearing, the court was set to hear defendant's *Faretta* request, when defendant stated, "I requested this court date, and I did not

---

[2]  We summarize here only the general background facts.  We discuss additional facts pertaining to the issues raised on appeal in the next section as needed.

[3]  All further statutory references are to the Penal Code unless otherwise indicated.

know this court date was even put on for anything. And I haven't seen [defense counsel] since the day that we failed at the bail hearing. I'm here for a *Marsden* motion."[4] The court replied, "So that's a separate issue then. So my suggestion is we take up the *Marsden* first, and then we deal with the *Faretta*."[5]

Towards the end of the *Marsden* hearing, the following colloquy occurred:

"DEFENDANT: . . . I want a private attorney, and I want my case reheard.

"THE COURT: We haven't made a determination as to whether you're going to represent yourself.

"DEFENDANT: I will go pro per. I will absolutely go pro per.

"THE COURT: Are we back then to [the] *Faretta* motion?

"DEFENDANT: I don't even know what that means.

"THE COURT: Are you asking to represent yourself, sir?

"DEFENDANT: At this point in time, because you're refusing me the interest to get out of here to continue my interviews for private counsel absolutely.

"THE COURT: All right. And that then is not enough cause for *Faretta*—

"DEFENDANT: I actually demand my rights be protected. . . . I do not want assistance from the public, period. [¶] I am in full control of my vessel and my mind, and my decisions are mine to be made. I will represent myself."

---

[4] *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

[5] This would be the second *Marsden* hearing in the case.

At that point, the court focused on the *Faretta* motion and allowed the prosecutor to reenter the courtroom. The court then asked defendant to review the *Faretta* advisement waiver. Defendant refused to do so, stating he had "read them before." The court proceeded to review "all of his rights on the record." After advising defendant that by representing himself, he "would be waiving your right to an attorney," defendant replied, "I have the right to hire private counsel." The court asked, "So which is it, sir? Do you want to represent yourself or do you want to hire a private attorney?" At which point, the following colloquy occurred:

"DEFENDANT: I don't want a public defender.

"THE COURT: That's a different matter. Do you want to hire a private attorney or do you want to represent yourself?

"DEFENDANT: I'm going to represent myself until I get private counsel. I'm not going forward with this nonsense. It's a farce.

"THE COURT: That is not an unequivocal waiver. The Court is going to go ahead and deny the *Faretta* motion at this point."

After denying the *Faretta* motion, the court asked defense counsel a question, and defendant stated, "Absolutely not. You're not my attorney. You do not have my consent to proceed on my behalf in any capacity, period."[6]

---

[6] Two weeks after the denial of the *Faretta* motion, defense counsel expressed doubt as to defendant's competence. (§ 1368.) The trial court suspended proceedings, and in August 2018, determined defendant was incompetent to stand trial, and the following month, the court ordered him placed at Napa State Hospital. Six months later, in March 2019, the court found defendant's competency had been restored and reinstated the proceedings. The following month, the court heard and denied another *Faretta* motion. Defendant does not take issue with this second *Faretta* ruling.

On appeal, defendant contends the trial court erred in denying his *Faretta* motion because his request to represent himself was unequivocal.

"In *Faretta* . . . , the United States Supreme Court held that a defendant in a state criminal trial has a federal constitutional right to self-representation. ' "[I]n order to invoke the constitutionally mandated unconditional right of self-representation a defendant in a criminal trial should make an *unequivocal* assertion of that right within a reasonable time prior to the commencement of trial." [Citations.]' " (*People v. Skaggs* (1996) 44 Cal.App.4th 1, 5.) "In determining on appeal whether the defendant invoked the right to self-representation, we examine the entire record de novo." (*People v. Dent* (2003) 30 Cal.4th 213, 218.)

Defendant contends his case is "identical" to that of *Faretta.* In that case, Faretta requested to represent himself. (*Faretta, supra*, 422 U.S. 807.) Questioning by the trial judge revealed Faretta had "once represented himself in a criminal prosecution, that he had a high school education, and that he did not want to be represented by the public defender because he believed that that office was 'very loaded down with . . . a heavy case load.' " (*Ibid.*) The trial court accepted his waiver of assistance of counsel. (*Id.* at p. 808.)

However, several weeks later the judge sua sponte held a second hearing "to inquire into Faretta's ability to conduct his own defense, and questioned him specifically about both the hearsay rule and the state law governing" juror challenges. (*Faretta, supra*, 422 U.S. at p. 808.) "After consideration of Faretta's answers, and observation of his demeanor, the judge ruled" his waiver had not been intelligent and knowing and reversed his earlier ruling permitting self-representation. (*Ibid.*) The court also rejected his request to "act as cocounsel" and his three subsequent motions

"for the appointment of a lawyer other than the public defender." (*Id.* at p. 810 & fn. 5.)

The Supreme Court held Faretta had been "deprived . . . of his constitutional right to conduct his own defense." (*Faretta, supra*, 422 U.S. at p. 836.) The court stated, "weeks before trial, Faretta clearly and unequivocally declared to the trial judge that he wanted to represent himself and did not want counsel. The record affirmatively shows that Faretta was literate, competent, and understanding, and that he was voluntarily exercising his informed free will." (*Id.* at p. 835.)

The situation here is not "identical" to that presented in *Faretta*. Here, defendant's request to represent himself was not unequivocal. Rather, it appeared defendant repeatedly vacillated between his right to self-representation and the right to counsel because he did not want the public defender's office to represent him. Indeed, the request to represent himself came on the heels of his *Marsden* motion. While the mere fact that the defendant requests to represent himself after a *Marsden* motion has been denied does not demonstrate the *Faretta* request is necessarily equivocal (see *People v. Michaels* (2002) 28 Cal.4th 486, 524), "[e]quivocation of the right of self-representation may occur where the defendant tries to manipulate the proceedings by switching between requests for counsel and for self-representation, or where such actions are the product of whim or frustration." (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1002.)

The record here reflects that defendant's request for self-representation was based on his frustration with his public defender rather than the desire to represent himself, as defendant repeatedly stated he wanted to hire private counsel and refused to even read through the *Faretta* waiver form.

The trial court correctly ruled he did not make a clear and unequivocal request to represent himself.

### *Continuance*

On the day trial was set to begin, defense counsel informed the court that defendant had, three days earlier, told him he wanted to hire private counsel. Defense counsel stated he was "supposed to meet" with defendant that day, but defendant "indicated to me that he would like to hire a private attorney. He indicated he had reached out to a private attorney, and was intending to retain him to be here today."

However, the new counsel was not present and a retainer fee had not been paid.

Defense counsel explained, there had been "multiple attempts" by defendant to discharge him as his attorney. Counsel stated, "I do think that [defendant] has expressed to me that he has lost confidence in my capability to defend these charges. And because of that, I think there has been some miscommunication or breakdown in communication. . . . [¶] . . . [¶] I think things really changed, in his mind, according to our conversation on Thursday, he was really upset about the way things were going and he decided to do this on Friday, and would like a little more time to do that."

Before hearing from the prosecution, the court replied, "Certainly, if somebody had advised me Friday at any point that he was looking to retain counsel, and private counsel would be here this morning, that would be a different issue. But I was not aware that he was looking to retain private counsel. And it doesn't sound like that's occurred. And it is a little late in the game at this point to be asking for a continuance so he can hire private counsel. [¶] We set these matters for trial. He set them a few times with a

time waiver. It changed to no time waiver. So he has been aware [of] this trial date for some time."

In asking the court to deny the request, the prosecution stated, "these charges have been pending now for over . . . two years. And I think that had [defendant] wanted to hire an attorney previously, he's had ample opportunity to do so. [¶] I would note there have been the strenuous attempts to push this by [defendant] at earlier dates. It was continued out over his objection. So I don't believe that now is an appropriate time to request a continuance to hire another attorney. [¶] These cases are old, and I am ready to go to trial. The People's witnesses are lined up. . . . And to come in at this point on the morning when the jurors are supposed to be coming in, saying he wants another attorney, I don't think is timely."

Defense counsel maintained that since defendant was the one asking for a continuance, he did not "think that there's prejudice to anybody involved here," and "although the case was old, there was a time period that he was at the State Hospital as well. I don't think that portion of time should count."

In denying the request for a continuance, the trial court noted this was a "no time waiver matter," and that defendant "very purposefully withdrew a time waiver." The court reiterated defendant had not "retained someone," nor had anyone "sent a message to the Court that he or she cannot be here, but they have been retained." Further, there were a "number of witnesses lined up," and the matter was a "domestic violence case," which the court noted is treated "differently, as I'm required to by law" as "there is some priority to getting these cases concluded."

On appeal, defendant contends the "trial court's refusal to grant [him] a short continuance so he could retain counsel violated the Sixth Amendment."

8

"A continuance in a criminal trial may only be granted for good cause. (§ 1050, subd. (e).) 'The trial court's denial of a motion for continuance is viewed for abuse of discretion.' [Citation.] 'There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.'" (*People v. Mungia* (2008) 44 Cal.4th 1101, 1118 (*Mungia*).) A continuance to retain counsel "may be denied if the accused is 'unjustifiably dilatory' in obtaining counsel, or 'if he [or she] arbitrarily chooses to substitute counsel at the time of trial.'" (*People v. Courts* (1985) 37 Cal.3d 784, 790–791 (*Courts*).) Where no compelling circumstances existed to justify delaying a request for a continuance to retain counsel until the eve or day of trial, "the lateness of the continuance request [was] a significant factor which justified a denial." (*Id.* at p. 792, fn. 4.) Even if abuse of discretion is shown, the defendant must also show prejudice to justify reversal. (*Mungia*, at p. 1119.)

Defendant's request for a continuance was made orally on the day of trial after having withdrawn his waiver of his speedy trial rights. Defendant did not assert he had secured an agreement with private counsel to represent him, rather he was only "intending to retain" a new attorney. He conceded he had not paid a retainer but rather had only "made arrangements to make sure [the attorney] was going to get paid," and that he had sent the attorney "e-mails regarding" his case. Defendant did not state how long it would take to retain counsel or how long said counsel would take to become ready for trial, assuming he undertook defendant's representation. And although defendant repeatedly expressed dissatisfaction with the deputy public

9

defender, in the two years the case had been pending, he had never obtained new counsel.

Defendant's reliance on *People v. Byoune* (1966) 65 Cal.2d 345 (*Byoune*) is misplaced. In *Byoune*, the defendant was represented by the public defender. The day before the commencement of trial, the information was amended to add a second count. (*Id.* at p. 346.) The following day—the day of trial—the defendant immediately moved for a continuance to obtain private counsel. (*Ibid.*) He admitted he was indigent but stated his brother would pay for an attorney, and although he had not previously expressed dissatisfaction with his public defender, he stated the additional charge "caused him to reconsider his decision." (*Id.* at pp. 346–347.) In denying the motion for continuance, the trial court determined the additional count was not a cause for surprise as it arose out of the same facts and the defendant should have retained private counsel in the two months between arraignment and trial if he was dissatisfied with his public defender. (*Id.* at p. 346.)

The Supreme Court reversed. (*Byoune, supra*, 65 Cal.2d at p. 348.) The court held the addition of a new and more serious charge on the eve of trial "precluded defendant from obtaining private counsel before the scheduled commencement of trial." The People failed to explain why the added count was not included in the original information, and "no circumstances appear warranting the limitation" of the defendant's right to retain chosen counsel "in the interests of efficient judicial administration." (*Ibid.*)

Here, although defendant states "there can be no real question that [he] was dissatisfied with his appointed attorney," which he calls "a consistent theme throughout the proceedings," he never retained new counsel. Defendant asserts he was "not seeking to delay matters," and indeed

the prosecution was granted a continuance over his objection. However, unlike the defendant in *Buyone* who waited two months, here defendant had two years to retain private counsel and instead waited to the eve of trial.

Defendant acknowledges his "timing could have been better" but asserts he could not hire an attorney any sooner because he "spent what money he had to bail himself out of jail, and the record makes clear he only just raised the money to hire a new attorney." Even assuming this were the case, defendant still had not actually retained an attorney. Nor did he explain why the attorney he was seeking to retain had not shown up to court, why he had not paid the retainer, when he would do so, or any concrete details involving retention of private counsel. (*Courts, supra*, 37 Cal.3d at p. 791, fn. 3 [A continuance may also properly be denied if "participation by a particular private attorney was still quite speculative at the time the motion for continuance was made."]; cf. *id.* at pp. 791, 788 [record established defendant made "good faith, diligent effort" to obtain private counsel before trial date by contacting attorney two months before trial to discuss representation and fee, establishing a "lawyer-client relationship" by making financial arrangements with the attorney and paying his retainer, and because that attorney had "agreed to take the case" subject to a continuance being granted].)

Indeed, defendant waited over two years, despite the fact that in January 2018, when defendant asked for a public defender "for the purpose of allowing more time for me to swap out a solid attorney," the court warned, "Well, here's the problem. Here's the problem, this case is getting a bit old. And one of the things, you certainly have the right to hire your own lawyer if you're able to do that, but appointing the Public Defender sort of as a place holder for you doesn't really work that well. It's if I appoint them they're

11

appointed to represent you, and they will represent you, and if you decide that you want to hire somebody else, generally speaking you have a right to do that. [¶] . . . [¶] But, for example, the case has gotten very close to hearing or to trial the request to have a new attorney come in could be untimely. [¶] So do you understand that?" Defendant replied, "Of course."

Additionally, four months later, at the end of his *Marsden* motion, defendant once again expressed that he "wanted private counsel since day one." The court replied, he "still ha[d] enough time to retain an attorney," and asked defendant, "what efforts have you made to retain counsel?" Defendant stated he "was interviewing three more attorneys." The court once again warned, "if you want a private attorney, you need to get [a] move on this, because trial is on May 7th" and continued "Sir, if you have the funds to hire an attorney[], as far as I'm concerned the *Marsden* hearing is done, and you can just go ahead and make efforts to hire a private attorney, and we'll simply confirm the date of May 7th." Defendant replied, "I don't want to confirm the date of May 7th on a private attorney. I want to take this thing back to prelim."

Finally, defendant asserts it was error not to grant a continuance because "defense counsel . . . made clear . . . he was not ready for trial" (italics omitted) and in denying the motion for continuance, the trial court "forced appellant to trial with a self-admittedly unprepared lawyer not of his own choosing."[7] However, defendant neglects to mention that he himself did not meet with his attorney in order to prepare for trial. His defense counsel stated, "I believe that once Mr. Coleman indicated to me that he did not want

---

[7] After indicating it would deny the request for a continuance regarding "the private attorney," the court separately addressed the request for a continuance regarding defense counsel's readiness for trial.

12

me to be his attorney anymore, I think he believed that he wasn't going to talk to me anymore." When the court asked, "So if I can ask, [defense counsel] was willing to set aside time this weekend to actually sit down with you and have you talk about this latest discovery. Is there a reason why you didn't make yourself available?" Defendant replied, "Yes. Unfortunately, I do have to work." But upon further inquiry, defendant admitted that while he was working Saturday, on Sunday he also spent the day volunteering and "[c]ommunity building" at a "Women[']s rights advocacy" community event. This was not good cause. (*People v. Grant* (1988) 45 Cal.3d 829, 844 ["A continuance will be granted only on a showing of good cause. [Citation.] Both defendant and counsel must demonstrate that they exercised due diligence and all reasonable efforts to prepare for trial [citation], and the court has broad discretion to grant to deny the motion for continuance."].) Here, it was defendant's own lack of cooperation with his counsel that "created the need for a continuance." (*Ibid.*) In light of defendant's conduct, "the denial of a continuance was neither arbitrary nor a violation of due process." (*Ibid.*)

Based on the record before us, the trial court did not abuse its discretion in denying defendant's request for a continuance on the eve of trial.

### CALCRIM No. 361

The victim testified that on the day of the incident, defendant woke her at 2 or 3 a.m. and asked her to come outside to the pool house to listen to an audio recording of her at their home. Defendant claimed "he heard people having sex" on the audio and accused her of having sex with another man. The victim told him she did not hear anything, denied having an affair, and told him she would have to leave.

Later that day, after the victim returned home from work, defendant said he was leaving to go to work around 6:00 p.m. but he returned to the house about 30 minutes later. When he returned, he looked "angry," "upset," and "mad." He was "clenching his teeth, like angry," and asked to speak to the victim in the kitchen. He claimed to have "enhanced" the audio and wanted her to listen to it once again. She repeated that it was the same recording and that they were "[l]istening to the dryer in the background, the TV, or the radio on, the dog walking by, the fridge opening and closing." He then "pushed [her] head closer to the speaker" and told her to "[l]isten closer." As the recording played, defendant stated he could hear "people having sex." He "kept getting angrier, and angrier, and angrier, just flew into a rage." He then picked up the speaker and "smashed it down . . . on the desk." Defendant got between her and the sliding door, and the two "struggled." He grabbed her upper arms and wrists, and then he hit her in the face "with such force that [she] fell down." She stated, "I had kind of a face print on my face. . . . And I had a big gash on my upper check [*sic*]." Her "whole face was bloodied up on both sides," her "mouth was all bloody." She was "so scared," she urinated on herself.

She was able to hold on to the baby while she fell, but defendant "pried the baby out of [her] arms" when she was on the floor. She thought, "He's going to kill me, and then he going to kill her," and remembered thinking, "All I can do is scream my head off so someone can hear me." Defendant told her to stop screaming and he would give her the baby back. He did so, and she was able to call 911.

A neighbor had heard the yelling and came over to see what was happening. The neighbor can be heard in the background of the 911 call,

which was played for the jury. The victim and the neighbor then went over to the neighbor's house to wait for police to arrive.

Defendant testified on his own behalf that on the day of the incident, he attempted to have a "conversation" with the victim "about some suspicious activity that I heard over the baby cam." He denied raising his voice, slamming the speaker or pushing the victim's head toward the speaker. Instead, he stated she became "frantic" and "started to bolt straight down the hallway." He became concerned and followed her, as she "ran to the baby's crib and picked her up." She "was clutching onto [the child] rather tightly, and screaming in her ears."

Defendant was "[e]xtremely" worried about his daughter and asked the victim "to calm down, stop yelling, put the baby down, leave her alone." When the victim "opened up the sliding door and tried to run out," defendant became concerned she would fall while holding the child because of an approximately 38-inch drop to the ground from the sliding door. He "advanced on her" "threw my left arm out, and I pinned her, literally, in the door jamb as she was going out." He felt he had to do that "[b]ecause [of] the risk involved" and because "I knew I had to just neutralize the situation, period. By any means necessary." He took the baby from the victim, and at that point he states the victim started "grabbing at me, and telling me give her the baby, and saying things, and screaming." He turned to the victim and "in a stern voice," told her to "calm down." The victim stopped screaming, he handed her the baby back.

Defendant went outside "to gather myself together, and relax and calm down," and a neighbor came over to ask "What's going on?" Before leaving, he saw a scratch on the victim's face and conceded he "[p]erhaps" caused it. He did not see any blood on her face but could "only assume" the blood came

15

"from the scratch." When he last saw her, however, "she did not have the blood over her face."

He denied ever hitting the victim's face, but stated it was a "possibility" that he "grabbed her face" when he "pinned her in the door jamb [when] she was running out." On cross-examination, when asked, "How do you think she got those injuries" on her face, defendant responded in three different ways. First, he said, "You'll have to ask her. She was by herself." Later he responded, "Well, she said that there was someone in the backyard. So maybe it was that person that she had described in the backyard saying hello, hello." Finally, he acknowledged, after being shown photos of the victim's injuries, that he previously stated, "I'm going to have to assume that they were self-inflicted." However, he stated that was because it was "the only logical conclusion [he] could draw."

When discussing jury instructions, the court asked counsel, "Any objection to 361?" Defense counsel replied, "I don't recall anything off the top of my head, any adverse testimony." The court asked the prosecution, "I know there was testimony about a scratch versus injury to her face. Do you want to elaborate on that?" The prosecution responded, "Well, I think that he didn't have an explanation for her testimony that he caused injuries to her. So I think this instruction is appropriate." The court stated it was "going to give 361."

Accordingly, the court instructed the jury as follows: "If the defendant failed in [his] testimony to explain or deny evidence against [him], and if [he] could reasonably be expected to have done so based on what [he] knew, you may consider [his] failure to explain or deny in evaluating that evidence. Any such failure is not enough by itself to prove guilt. The People must still prove the defendant guilty beyond a reasonable doubt. [¶] If the defendant failed to

16

explain or deny, it is up to you to decide the meaning and importance of that failure." (CALCRIM No. 361.)

On appeal, defendant contends there was "no basis to issue the instruction" because he "testified fully as to the incident" and "never failed to explain or deny the scratch or injuries" the victim sustained. Further, defendant maintains that "because this error allowed the jury to improperly draw a negative inference about [his] testimony—which was the sole direct evidence supporting the proffered defense—the error was prejudicial," and reversal is required as to counts 1 (corporal injury to a cohabitant) and 2 (false imprisonment).

"CALCRIM No. 361 rests on the logical inference that if a person charged with a crime is given the opportunity to explain or deny evidence against him or her but fails to do so, then that evidence may be entitled to added weight. [Citation.] The focus of the instruction, 'as its language indicates, is not on the defendant's credibility as a witness, but on the role of a testifying defendant's failure to explain or deny incriminating evidence in how jurors "evaluat[e] that evidence," i.e., the evidence the defendant has failed to explain or deny.' [Citations.] However, in discussing a substantially similar pattern instruction—CALJIC No. 2.62—our high court recognized, ' "It is an elementary principle of law that before a jury can be instructed that it may draw a particular inference, evidence must appear in the record which, if believed by the jury, will support the suggested inference." ' [Citation.] Thus, CALCRIM No. 361 'is not to be given every time a defendant testifies.' " (*People v. Grandberry* (2019) 35 Cal.App.5th 599, 605–606 (*Grandberry*).)

"A CALCRIM No. 361-based jury instruction 'applies only when a defendant completely fails to explain or deny incriminating evidence, or

17

claims to lack knowledge and it appears from the evidence that the defendant could reasonably be expected to have that knowledge.' [Citation.] Where a defendant's testimony contradicts or stands in conflict with the state's evidence, such 'contradiction is not a failure to explain or deny.' [Citations.] Nor is the instruction appropriate even when a defendant's testimony may seem 'improbable, incredible, unbelievable, or bizarre.' [Citation.] As our high court explained, '[t]he instruction acknowledges to the jury the "reasonable inferences that may flow from *silence*" when the defendant "fail[s] to explain or deny evidence against him" and "the facts are peculiarly within his knowledge." ' [Citation.] Accordingly, the task of the reviewing court in examining a claim that a CALCRIM No. 361-based jury instruction was improperly given is 'to ascertain if [the] defendant . . . failed to explain or deny any fact of evidence that was within the scope of relevant cross-examination' and was 'withing [the defendant's] knowledge which he did not explain or deny.' " (*Grandberry, supra*, 35 Cal.App.5th at p. 606.)

We need not, and do not, decide whether it was error to give CALCRIM No. 361 in this case, because, even assuming the court erred in doing so, any such error was harmless. (See *People v. Guiton* (1993) 4 Cal.4th 1116, 1129–1130 [An error in giving an instruction that correctly states a principle of law but has no application to the facts of the case is one of state law subject to the traditional *People v. Watson* (1956) 46 Cal.2d 818, 836 test.].)

Here, it is not reasonably probable the result would have been more favorable to defendant had the instruction been omitted. The jury heard from the victim, heard the 911 call where the victim stated defendant had hit her, and saw photographs of the victim's injuries. A neighbor also testified that she heard a "blood curdling" "dire scream," and when she went to check

18

on the victim, she found her on the phone calling 911, with a "bloody" face, and the victim "was shooken up" and "had peed her pants."

Thus, this was hardly the "quintessential he-said she-said case" defendant suggests. Nor is there any merit to defendant's assertion that the jury "struggled mightily in this case" because the jury "unanimously acquitted" him on counts 6 and 7. Counts 6 (burglary) and 7 (grand theft) involved entirely different crimes that occurred a month after the domestic violence incidence. Accordingly, the jury's acquittal on those charges says nothing about the state of the evidence on the charges arising from the domestic violence incident.

In sum, even assuming for sake of argument that the trial court erred in instructing on CALCRIM No. 361, any such error was harmless.

### Stay-Away Order

At the sentencing hearing, the prosecutor requested a 10-year "no contact . . . order for both the victim and her daughter." In doing so, the prosecutor highlighted some of defendant's behavior: Defendant had posted "dozens of videos on his social media, postings of Mr. Coleman videoing himself talking about this case, talking about wanting to get his daughter back, talking about the actions that he will take in order to get his daughter back."

The court also considered the probation report. The report stated defendant "showed no remorse for his actions, let alone accountability" but rather "placed blame on the victim and told stories vilifying the victim." Defendant had become "highly consumed with proving his innocence," and the report "noted a number of Federal civil claims he has made against attorneys, the victim, her family, deputies, and the jail." He also was "obsess[ing] over this case on Facebook, where he claims to be a civil rights

19

advocate" and "posts excessive monologues accusing the victim of kidnapping, committing perjury, and dissecting court transcripts and evidence relating to the case" with no apparent "end in sight."

Finally, the victim stated defendant had a "history of violence, erratic behavior, and psychotic incidences," that he had repeatedly ignored previous stay-away orders, and that he had made "false report[s]" to her friends, family, neighbors, Child Protective Services, Napa Emergency Women's Services, and the police and sheriff's departments about her, including that she was a "drug addict, and that I abuse my daughter."

The court issued the order as to the victim and defendant's daughter pursuant to section 273.5, subdivision (j).

On appeal, defendant contends the trial court erred in including his daughter in the stay-away order because she "was not a victim of any of the charged crimes" within the meaning of section 273.5, subdivision (j). (Capitalization omitted.)

" 'Issues of statutory interpretation are questions of law subject to our independent or de novo review. [Citations.] "The fundamental purpose of statutory construction is to ascertain the intent of the lawmakers so as to effectuate the purpose of the law. [Citations.] In order to determine this intent, we begin by examining the language of the statute. [Citations.] But '[i]t is a settled principle of statutory interpretation that language of a statute should not be given a literal meaning if doing so would result in absurd consequences which the Legislature did not intend.' [Citations.] Thus, '[t]he intent prevails over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act.' [Citation.] Finally, we do not construe statutes in isolation, but rather read ever statute 'with reference to the entire scheme of law of which it is part so that the whole may be harmonized and

20

retain effectiveness.'" ' " (*People v. Delarosarauda* (2014) 227 Cal.App.4th 205, 210 (*Delarosarauda*).)

Section 273.5, subdivision (j) provides, "Upon conviction under subdivision (a), the sentencing court shall also consider issuing an order restraining the defendant from any contact with the victim, which may be valid for up to 10 years, as determined by the court.  It is the intent of the Legislature that the length of any restraining order be based upon the seriousness of the facts before the court, the probability of future violations, and the safety of the victim and his or her immediate family.  This protective order may be issued by the court whether the defendant is sentenced to state prison or county jail, or if imposition of sentence is suspended and the defendant is placed on probation."

In *Delarosarauda*, a case on which defendant relies, a jury convicted the defendant of corporal injury to a spouse, assault by means likely to produce great bodily injury, assault with a deadly weapon, and misdemeanor vandalism. (*Delarosarauda, supra*, 227 Cal.App.4th at p. 208.)  The trial court ordered the defendant to stay away from the victim and her two children—the defendant's son and stepdaughter—for 10 years pursuant to section 237.5. (*Delarosarauda,* at pp. 208–209.)  On appeal, the defendant contended the trial court lacked authority under that section to issue such an order. (*Id.* at pp. 209–210.)

The Court of Appeal agreed, holding "[u]nder the plain language of section 273.5, the court lacked authority to issue a protective order as to [the children].  First, [the children] are not victims under section 273.5, subdivision (j).  [The victim] confirmed the appellant never used physical force against them [citation].  Second, . . . the second sentence of section 273.5, subdivision (j)—addressing the length of the restraining order—does

21

not modify the term 'victim' in the first sentence or expand it to include the children. Our interpretation is bolstered by the fact that the children do not fall within one or more of the categories of victims listed in section 273.5, subdivision (b). That statutory section limits the applicability of section 273.5, subdivision (a) to certain victims (spouses, cohabitants, fiancées, or parents of the offender's child), and correspondingly limits the scope of the restraining order authorized by section 273.5, subdivision (j). Thus, section 273.5, subdivision (j) does not authorize the court to issue a protective order as to [the children]." (*Delarosarauda, supra,* 227 Cal.App.4th at p. 213.)[8]

The Attorney General acknowledges *Delarosarauda* but contends the "reasoning of [that case] takes too cramped and restrictive a view of the meaning 'victim.'" Citing to *People v. Beckemeyer* (2015) 238 Cal.App.4th 461 (*Beckemeyer*) and *People v. Race* (2017) 18 Cal.App.5th 211 (*Race*), the Attorney General contends "[c]ourts have further construed the term 'victim' broadly enough to protect the immediate family members of a named victim of a charged crime if those family members have themselves been physically or emotionally harmed by the crime.

In *Beckemeyer*, the defendant pleaded guilty to attempted murder of a woman he had previously dated and to assault with a deadly weapon of the victim's adult son. (*Beckemeyer, supra*, 238 Cal.App.4th at p. 464.) The trial court ordered the defendant not to have any contact with the victim and her son for 10 years pursuant to section 136.2, subdivision (i)(1)—a substantially similar statute as the one at issue here. (*Beckemeyer,* at pp. 463–464.) In upholding the order, the Court of Appeal held that "the statute encompasses

---

8 For similar reasons, the court also held the trial court lacked authority to issue the no-contact protective order as to the child under section 136.2, subdivision (i)(1). (*Delarosarauda, supra*, 227 Cal.App.4th at pp. 211–212.)

a person, like [the son], who was *actually assaulted* during the domestic violence incident, and who accordingly meets the broad definition of 'victim' set forth in the statutory scheme." (*Id.* at p. 463.)

In *Race*, the defendant pleaded no contest to attempted lewd and lascivious acts upon a child under the age of 14 against his niece, and the court dismissed the count as to his daughter. (*Race, supra*, 18 Cal.App.5th at pp. 213, 215.) The trial court ordered the defendant to stay away from his niece and daughter for 10 years pursuant to section 136.2, subdivision (i)(1). (*Race,* at p. 216.) In upholding the order, the Court of Appeal held that "section 136 defines a 'victim' in a broad enough manner in which to include a victim of a charged count of which defendant does not stand convicted so long as the court had some competent evidence before it with which to conclude there was reason to believe the individual was a victim of a broadly defined domestic-violence-related offense involving harm or attempted harm such that a criminal protective order should be issued." (*Id.* at p. 216.)

Of course, *Beckemeyer* and *Race* involve section 136.2 and not section 273.5 and assuming section 136.2 could apply, the question remains whether the trial court had authority to issue the order pursuant to that section.[9]

---

[9] The Attorney General also cites *People v. Clayburg* (2012) 211 Cal.App.4th 86. In that case, a jury convicted the defendant of two counts of stalking her former husband, the father of their daughter. (*Id.* at p. 88.) The trial court ordered the defendant not to have any contact with daughter for 10 years pursuant to section 646.9, subdivision (k)(1)—a substantially similar statute as the one at issue here. (*Clayburg,* at p. 88.) On appeal, the court held that "a member of the immediate family of a stalking victim (§ 646.9, subd. (a)) who suffers emotional harm, here a child, is a 'victim' for purposes of a postconviction restraining order." (*Ibid.*) However, we need not and do not address whether section 646.9, subdivision (k)(1) is similar to sections 136.2, subdivision (i)(1) or 273.5, subdivision (j) because there is nothing in the record to indicate the victim's daughter suffered emotionally or was traumatized by defendant's conduct.

Section 136.2, subdivision (i)(1) provides, "When a criminal defendant has been convicted of a crime involving domestic violence as defined in Section 13700 . . . ,[10] the court, at the time of sentencing *shall* consider issuing an order restraining the defendant from any contact with a victim of the crime. . . . It is the intent of the Legislature in enacting this subdivision that the duration of a restraining order issued by the court be based upon the seriousness of the facts before the court, the probability of future violations, and the safety of a victim and the victim's immediate family." (Italics added.) Accordingly, the trial court was statutorily required to consider imposition of a protective order under section 136.2, subdivision (i)(1) as part of the sentence in light of defendant's conviction for section 273.5.

As the case law reflects, "for purposes of a section 136.2 protective order, 'victim' is broadly defined in section 136 as any person against whom there is a reason to be believe a crime has been committed" or attempted to be committed. (*Beckemeyer, supra,* 238 Cal.App.4th at p. 466; see *Race, supra,* 18 Cal.App.5th at p. 219 ["the term 'victim' pursuant to section 136.2 criminal protective orders must be construed broadly to include any individual against whom there is 'some evidence' from which the court could find the defendant had committed or attempted to commit some harm within the household"].) "[I]n determining whether to issue a criminal protective

---

[10] " 'Domestic violence' " is defined in section 13700, subdivision (b) as "abuse committed against . . . a spouse, former spouse, cohabitant, former cohabitant, or person with whom the suspect has had a child or is having or has had a dating or engagement relationship." " 'Abuse' " is defined in subdivision (a) of section 13700 as "intentionally or recklessly causing or attempting to cause bodily injury or placing another person in reasonable apprehension of imminent serious bodily injury to himself or herself, or another."

order pursuant to section 136.2, a court may consider all competent evidence before it." (*Race,* at p. 220.)

We need not, and do not, decide whether the definition of "victim" used in section 136.2 was too narrowly interpreted in *Delarosarauda* as the case is distinguishable. Unlike in *Delarosarauda*, where testified the victim testified the defendant " 'never touched' the children, and no evidence suggests [he] ever attempted to harm them," here, there was ample evidence defendant attempted to harm the victim's infant daughter.[11] According to the victim's testimony, defendant restrained and punched her while she was holding the child; indeed, defendant hit her so hard she fell to the ground with the infant in her arms, and he then "pried the baby out of [her] arms." Moreover, defendant had posted "dozens of videos on his social media, postings of . . . himself talking about th[e] case, talking about wanting to get his daughter back, talking about the actions that he will take in order to get his daughter back." The victim further testified both the child's grandparents and her daycare had to have security cameras installed out of concern for the child's safety.

The court expressly stated it was "concerned about just the level of paranoia" defendant was exhibiting and shared "similar concerns that probation has that [defendant is] just obsessing over this case, the relationship, the fact that [the victim] has chosen to take steps to protect herself, her child. I don't think he can let it go. And I have real concerns that

---

[11] We agree with respondent that defendant—having failed to object on this ground below—has "forfeited" any claim that substantial evidence does not support the order. (*Race, supra*, 18 Cal.App.5th at p. 219, fn. 4.) However, "[h]aving concluded that the court's protective order as to defendant's daughter was legally authorized, we discuss the sufficiency of the evidence to support that order to forestall defendant's ineffective assistance of counsel claim." (*Ibid.*)

he's going to continue to try to contact her." (*Race, supra*, 18 Cal.App.5th at p. 219 ["the subject of a protective order pursuant to section 136.2, subdivision (i)(1) need not be a named victim of one of the offenses for which the defendant stood convicted; rather, such a protective order could issue with respect to someone against whom some evidence suggested the individual had been 'targeted or harmed' by the defendant"].)

Given the evidence before it, the trial court had authority to issue a protective order in favor of the victim and her daughter under section 136.2, subdivision (i)(1).

We further conclude it is of no import that the trial court erroneously relied on section 273.5, rather than 136.2, since as the Attorney General points out " ' " [n]o rule of decision is better or more firmly established by authority, nor one resting upon a sounder basis of reason and propriety, than that a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason. If right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion." ' " (*People v. Zapien* (1993) 4 Cal.4th 929, 976.) We shall therefore direct the trial court to check the correct box—the box marking section 136.2, subdivision (i)(1)—and to delete the check mark indicating section 273.5, subdivision (j).

## DISPOSITION

The judgment is affirmed. The trial court is directed to prepare a corrected protective order, in accordance with this opinion, and to forward a copy of the corrected order to the appropriate entities.

_____

Banke, J.

We concur:

_____

Humes, P.J.

_____

Margulies, J.

A159933, *People v, Coleman*

27